THE CITY OF CHICAGO, Petitioner-Appellee, *v.* SIDNEY S. GORHAM, JR., *et al.*, Respondents.—(ONE STOP, INC., *et al.*, Respondents-Appellants.)

First District (1st Division)   No. 79-1712

Opinion filed January 7, 1980.

Melvin B. Lewis, of Chicago, for appellants.

William R. Quinlan, Corporation Counsel, of Chicago (Earl L. Neal, Special Assistant Corporation Counsel, of counsel), for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Petitioner, City of Chicago (City), brought an eminent domain action to acquire the property known as the Sherman House Hotel. Respondents, certain sublessees of stores in the building (tenants), filed a traverse, contesting the City's authority to acquire the property. The trial court denied the traverse and subsequently entered judgment for the City, setting the value of the property at $13.2 million. The tenants appeal.

This controversy concerns the Chicago Loop block bounded by La Salle, Lake, Clark and Randolph Streets, and primarily occupied by the Sherman House Hotel. On November 21, 1978, the Commercial District Development Commission (Commission) designated the subject property as a "blighted commercial area" which is defined in the Municipal Code of Chicago (1977), ch. 15.1, §15.1—1(d), as:

> "* * * any area of not less in the aggregate than two acres located within the territorial limits of the City of Chicago where 75% of the land area is devoted to a commercial use and where commercial buildings or improvements, because of age, dilapidation, obsolescence, over-crowding, lack of ventilation, light, sanitary facilities, inadequate utilities, excessive land coverage, deleterious land use or layout, inadequate and ineffective use, failure to produce a proper share of tax revenues or provide employment commensurate with the capacity of the area, or any combination of these factors, are detrimental to the public safety, health, morals, welfare, and economic stability."

The Commission relied upon a report submitted by the department of planning, city and community development, based on studies made over a five-year period. The report indicated that excluding the parking garage at the corner of Lake and La Salle, only 8% of the 960,000 square feet of commercial space is occupied. Three-quarters of the structures are in a deteriorated condition. The report concluded:

> "This unutilized space creates a void in the central business district that fails to produce a proper share of tax revenues or to provide adequate employment commensurate with the capacity of the area."

On December 20, 1978, the Chicago city council approved the Commission's designation of the area as commercial blight. On February 15, 1979, the City of Chicago filed a petition to condemn, through eminent domain, the subject property. On April 16, 1979, certain tenants filed a traverse to the City's petition.

On May 15, 1979, the Commission approved a redevelopment plan for the property. The plan envisioned the transfer of the property to the Illinois Capital Development Board (Board) at a price equal to acquisition costs, for the construction of a new State of Illinois Building. It was further provided that the property "* * * should be devoted primarily to public use. Any other use must be related to and compatible to the primary use." The objectives of the plan were:

> "a. Remove economically obsolescent and incompatible land use.
>
> b. Provide parcels of land sufficient in size and configuration to permit public institutional development.

c. Provide the residents of the State of Illinois with an increased level of public institutional services.

d. Consolidate available governmental and public institutional uses through the development of a State of Illinois facility in close proximity to City Hall, the County Building, and the Richard J. Daley Center.

e. Anchor and encourage the contemplated redevelopment of the adjacent North Loop Area, as set forth in the 'Redevelopment Plan for Blighted Commercial Area North Loop, March, 1979.' "

Finally, the plan noted that the Board "has agreed to work with the City of Chicago to design a facility" compatible to and harmonious with the contemplated North Loop redevelopment project.

The tenants contended that the City could not lawfully take the subject property for the purpose of resale to the State. This issue was briefed and argued by the parties. The trial court denied the traverse, finding that the City sought to properly utilize its power of eminent domain for clearance of a blighted commercial area.

The cause then proceeded to the question of valuation. Under the terms of their leaseholds, the tenants had no right to participate in the division of any condemnation award. Accordingly, they had no standing to question the adjudication of value and did not participate in this phase of the case. Prior to trial, the owners of the subject property and the City agreed upon the fair market value of the property. On October 17, 1979, the City presented evidence on the value of the property. Following this hearing, the trial court entered a judgment finding the property's fair market value to be $13.2 million.

The tenants' principal contention on appeal is that the City may not use its eminent domain power to acquire property for the State of Illinois. The Board itself has no eminent domain powers. (Ill. Rev. Stat. 1977, ch. 127, pars. 771-792.) However, the tenants argue that the State must use its eminent domain powers to acquire the subject property for the Board, rather than allow the City to act as a surrogate purchasing agent.

The City maintains that later disposition of the subject property to the State is irrelevant because acquisition for redevelopment and clearance itself is a sufficient and valid purpose of eminent domain. We agree.

Eminent domain is the right of a sovereign State or its lawful delegate to condemn private property for public use upon payment of just compensation to the owner. (*Sanitary District v. Manasse* (1942), 380 Ill. 27, 42 N.E.2d 543.) It is essential that property be taken for a public use. (*City of Chicago v. Barnes* (1964), 30 Ill. 2d 255, 195 N.E.2d 629.) However, when the primary purpose of an eminent domain proceeding is a public use, it is immaterial that a private enterprise or another

governmental entity incidentally gains a benefit. Compare *Chicago Land Clearance Com. v. White* (1952), 411 Ill. 310, 104 N.E.2d 236, *cert. denied* (1952), 344 U.S. 824, 97 L. Ed. 641, 73 S. Ct. 23, with *City of Chicago v. R. Zwick Co.* (1963), 27 Ill. 2d 128, 188 N.E.2d 489, *appeal dismissed sub nom. Gonzalez v. Chicago* (1963), 373 U.S. 542, 10 L. Ed. 2d 687, 83 S. Ct. 1538.

The tenants do not contest the authority of the City of Chicago, as a home rule unit (Ill. Const. 1970, art. VII, §6), to exercise eminent domain powers pursuant to the Municipal Code of Chicago (1977), ch. 15.1. See *Chicago, Burlington & Quincy R.R. Co. v. Cavanagh* (1917), 278 Ill. 609, 116 N.E. 128.

The Illinois Supreme Court has consistently held that the acquisition of slum and blighted areas for clearance and redevelopment is itself a taking for a public purpose regardless of the subsequent use of the property. (*City of Chicago v. Walker* (1971), 50 Ill. 2d 69, 277 N.E.2d 129, *cert. denied sub nom. Blankuer v. City of Chicago* (1972), 408 U.S. 931, 33 L. Ed. 2d 343, 92 S. Ct. 2498; *City of Chicago v. Barnes* (1964), 30 Ill. 2d 255, 195 N.E.2d 629; *City of Chicago v. R. Zwick Co.* (1963), 27 Ill. 2d 128, 188 N.E.2d 489, *appeal dismissed sub nom. Gonzalez v. Chicago* (1963), 373 U.S. 542, 10 L. Ed. 2d 687, 83 S. Ct. 1538; *Chicago Land Clearance Com. v. White* (1952), 411 Ill. 310, 104 N.E.2d 236, *cert. denied* (1952), 344 U.S. 824, 97 L. Ed. 641, 73 S. Ct. 23.) Moreover, it is equally clear that clearance and redevelopment of blighted commercial areas as well as residential slums satisfies a public purpose. (*People ex rel. City of Urbana v. Paley* (1977), 68 Ill. 2d 62, 368 N.E.2d 915.) The *Paley* court found (68 Ill. 2d 62, 74-75):

> "* * * [T]he fact that the statute provided an impetus to *economic development* satisfied the requirement of public purpose. Similarly, in the case at bar, the city's determination to promote the commercial rebirth of its downtown area is a public purpose * * *. In so holding, today's decision denotes that the application of the public-purpose doctrine to sanction urban redevelopment can no longer be restricted to areas where crime, vacancy, or physical decay produce undesirable living conditions or imperil public health. Stimulation of commercial growth and removal of economic stagnation are also objectives which enhance the public weal. * * *" (Emphasis in original.)

We believe these holdings are determinative of this cause and that the State's ultimate use of this property does not affect the City's authority to acquire the subject property. Nonetheless, we will comment upon the tenants' contentions.

They concede, in their reply brief, that the clearance of slum and blighted area via eminent domain proceedings constitutes a public

purpose and a proper municipal function. However, they assert that the primary purpose of this proceeding was not clearance of commercial blight but the acquisition of land for State purposes. Hence, they argue that the State alone was the proper condemning authority.

We do not agree with their characterization of primary and incidental purposes. Rather, we find the record conclusively establishes the purpose of the acquisition as "the eradication, redevelopment and rehabilitation of [a] blighted commercial area" and to "acquire and remove obsolescent land uses." Undoubtedly, under the redevelopment plan for the property the State was to be the ultimate owner of the land. While the purpose for which the power of eminent domain is exercised may be questioned, in the absence of clear abuse of power, the motives that prompt condemnation are not subject to judicial investigation. (*City of Chicago v. R. Zwick Co.* (1963), 27 Ill. 2d 128, 132, 188 N.E.2d 489, *appeal dismissed sub nom. Gonzalez v. Chicago* (1963), 373 U.S. 542, 10 L. Ed. 2d 687, 83 S. Ct. 1538.) Because of the City's stated purpose of clearing a blighted commercial area, we believe the tenants' attack upon resale to the State is an improper attempt to delve into the City's motive for condemnation.

We also note that the tenants do not contest the characterization of the subject property as a "blighted commercial area." Yet, they maintain that the State should be the proper condemning authority. In our view, this logic leads to the absurd result that the State is responsible for initiating the clearance of a City slum area.

The tenants also contend that the State was a necessary party to this eminent domain proceeding and that the City lacked standing to bring this cause. Central to this contention is that the State would ultimately pay all acquisition costs. The tenants do not directly challenge the adjudication of compensation (they concede their leases preclude their sharing any part of this compensation). Nonetheless, they maintain that compensation is tangentially related to the issue of standing: *i.e.*, the City adjudicated the issue of fair compensation, yet could not be adversely affected by this adjudication, whereas the State, which was affected by the judgment, had no representation in the litigation.

In short, the tenants contend that the City lacked standing as the proper condemning authority because it could not protect the State's financial interests. Our rejection of this argument is twofold: (1) the trial court assured fair compensation by requiring a prove-up of market value and by judicial approval of the $13.2 million settlement; and (2) the State may properly guard its financial interests short of litigation via cooperation and negotiation with the City.

The owners and City agreed that the fair market value of the property was $13.2 million. At the prove-up, two expert witnesses testified

regarding the market value of the property. One was of the opinion that the fair cash market value of the property was $13.2 million; the other expert believed $13.5 million represented the market price. At the conclusion of the hearing, the court entered a judgment finding that the fair cash market value was $13.2 million. Accordingly, in light of the evidence adduced and procedures employed by the trial court, the State could be assured that its financial interests were adequately safeguarded.

Finally, we note that the spirit of State/municipal cooperation demonstrated in this cause should be complimented rather than castigated. In this litigious era, the State's negotiated arrangement with the City and avoidance of direct participation in the instant lawsuit is most welcome. Furthermore, the Attorney General has not been derelict in his duties as suggested by the tenants. The Attorney General's office would most assuredly oversee all legal aspects of the transfer of the subject property from the City to the Board. The Attorney General has no litigation role to fulfill in an acquisition made by the City and we assume that his office will properly serve the State's interests concerning the subsequent disposition of this property.

We have carefully reviewed other contentions voiced by the tenants and find them either unpersuasive or immaterial to this appeal.

In summary, the City of Chicago's acquisition of the subject property is not "for" the State of Illinois, but for the purpose of clearance and redevelopment. Therefore, this cause is not an attempt to conduct "surrogate litigation" or to usurp the function and duties of the Attorney General. No public body is called upon to exercise any unauthorized power. The City is authorized to acquire property to clear and redevelop blighted commercial areas. The Board is authorized to receive real property and construct public buildings. (Ill. Rev. Stat. 1977, ch. 127, par. 779.01.) State involvement in this cause is, accordingly, unnecessary.

■■ For the aforementioned reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.