SOUTHWESTERN ILLINOIS DEVELOPMENT AUTHORITY, Plaintiff-Appellee, v. NATIONAL CITY ENVIRONMENTAL, L.L.C., *et al.*, Defendants-Appellants (Unknown Owners, Defendants).

Fifth District    No. 5—98—0263

Opinion filed April 29, 1999.—Rehearing denied May 26, 1999.

KUEHN, J., specially concurring.

Jerold S. Solovy, Barry Levenstam, Jeff S. Pitzer, and Jeremy M. Taylor, all of Jenner & Block, of Chicago, and Daniel Schattnik, of Unsell, Unsell, Schattnik & Hale, of East Alton, and Sharon S. Costa, of Mt. Vernon, for appellants.

Harry J. Sterling of Harry J. Sterling, P.C., of Fairview Heights, and Robert Becker, of Becker, Paulson & Hoerner, P.C., of Belleville, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

National City Environmental, L.L.C. (NCE), and St. Louis Auto Shredding Company (St. Louis Auto) appeal from the circuit court's decision that approved an eminent-domain quick-take action brought by Southwestern Illinois Development Authority (SWIDA). NCE and St. Louis Auto raise five arguments on appeal: (1) SWIDA lacks the constitutional authority to take NCE's land and convey it to a private party for private profit, (2) the circuit court erred in allowing SWIDA to use its quick-take powers without obtaining the approval of East St. Louis, (3) the court erred in failing to dismiss SWIDA's condemnation complaint because SWIDA failed to give 60 days' notice to NCE, (4) the court erred in ruling that quick-take was appropriate without a

showing of immediate need, and (5) SWIDA failed to make a good-faith attempt to negotiate. SWIDA questions this court's jurisdiction over these issues. We reverse.

The jurisdictional issue must be addressed first. This case arises from an interlocutory appeal pursuant to Supreme Court Rule 307(a)(7) (166 Ill. 2d R. 307(a)(7)) and section 7—104(b) of the Eminent Domain Act (735 ILCS 5/7—104(b) (West 1996)). *Southwestern Development Authority v. Vollman*, 235 Ill. App. 3d 32, 600 N.E.2d 926 (1992), held that, in an interlocutory appeal pursuant to Supreme Court Rule 307(a)(7) and section 7—104(b) of the Eminent Domain Act, only three issues could be raised: (1) whether the plaintiff has the authority to exercise the right of eminent domain, (2) whether the property taken is subject to the exercise of such right, and (3) whether the right is being properly exercised in the proceeding. Thus, defendants' interlocutory appeal in this case is limited to the three issues described in section 7—104(b). In this case, that would include defendants' issues (1), (2), and (3). Issues (4) and (5) are appealable at the conclusion of the eminent-domain proceeding. See *Vollman*, 235 Ill. App. 3d 32, 600 N.E.2d 926.

NCE operates a metal-recycling center located in what, until recently, was National City, Illinois. NCE has been at its present location since 1975 and employs 80 to 100 people full time. NCE's factory shreds cars and appliances and separates the reusable metals. It disposes of nearly 100,000 cars per year. The nonrecyclable by-products are referred to as "fluff." Fluff is deposited into NCE's landfill, which is located to the east of its recycling center. When this landfill reaches capacity, NCE plans to expand its landfill operations onto a 148.5-acre tract of land NCE owns to the east of the current landfill. NCE currently uses the clay and dirt from the 148.5-acre tract to cover the fluff in the existing landfill.

In 1987, the Illinois General Assembly passed the Southwestern Illinois Development Authority Act (Ill. Rev. Stat. 1987, ch. 85, par. 6151 *et seq.* (now 70 ILCS 520/1 *et seq.* (West 1996))), which created SWIDA. SWIDA has the authority to take land by eminent domain, via its quick-take powers (see 735 ILCS 5/7—103 (West 1996)). The legislature set forth the following policy reasons for SWIDA's existence:

> "(c) That the State has a responsibility to help create a favorable climate for new and improved job opportunities for its citizens by encouraging the development of commercial and service businesses and industrial and manufacturing plants within the southwestern part of the State;
>
> * * *

(f) That in order to foster civic and neighborhood pride, citizens require access to *** entertainment and sports ***; [and]

(g) That the main purpose of this Act is to promote industrial, commercial, residential, service, transportation[,] and recreational activities and facilities, thereby reducing the evils attendant upon unemployment and enhancing the public health, safety, morals, happiness[,] and general welfare of this State." 70 ILCS 520/2 (West 1996).

SWIDA advertises that, in exchange for fees and expenses, it will condemn land at the request of private developers to assist in advancing these policies.

Gateway International Raceway, a motorsports raceway, is located adjacent to NCE. In 1994, Grand Prix Association of Long Beach, Inc. (GPALB), a California corporation, decided to purchase Gateway International Raceway and to replace its existing facility with a new raceway. In June 1996, SWIDA issued $21.5 million in taxable sport-facility revenue bonds and loaned the proceeds to GPALB. GPALB used these funds to acquire Gateway International· Raceway and to transform it into a facility capable of hosting major stock-car races.

In early 1998, GPALB (hereinafter referred to as Gateway) sought to expand its parking capacity, and it attempted to discuss the purchase of NCE's land with NCE's owner, but NCE would not discuss the matter. Gateway made no offers to NCE for its property. Instead, Gateway asked SWIDA to exercise its quick-take powers to take NCE's 148.5-acre tract and convey it to Gateway. In its February 20, 1998, application to SWIDA, Gateway stated that it wanted to use NCE's land as a parking lot for the purpose of further increasing the value of Gateway's racetrack. In March 1998, Gateway president Rod Wolter met with former United States Senator Alan Dixon, SWIDA's executive director Alan Ortbals, and a representative from NCE to discuss the purchase of NCE's property. At that time, Gateway offered $1 million to NCE's representative, and NCE declined it. On March 20, 1998, SWIDA made the same offer to NCE and advised NCE that SWIDA would initiate condemnation proceedings to take NCE's land if NCE did not accept the offer.

NCE refused the offer and SWIDA filed a quick-take proceeding. On April 27, 1998, the trial court ruled in SWIDA's favor, fixed the value of the land at $900,000, and on April 30, 1998, conveyed it to SWIDA. On April 30, 1998, SWIDA conveyed the land to Gateway.

The controlling question in this case is whether SWIDA had constitutional authority to take NCE's land and convey it to Gateway for private profit. SWIDA argues that the issue is not the proper subject of an interlocutory appeal under Rule 307(a)(7). We disagree.

Defendants are not questioning the constitutionality of SWIDA's eminent-domain authority. Rather, defendants challenge the constitutionality of SWIDA's conduct in this case.

NCE concedes that SWIDA has the authority to exercise the right of eminent domain and that NCE's property is subject to the exercise of such right. However, NCE insists that the acquisition of land by eminent-domain proceedings must be for a public purpose and that land may not be condemned for private use. See *City of Chicago v. Barnes*, 30 Ill. 2d 255, 257, 195 N.E.2d 629, 631 (1964). Moreover, in Illinois it is well settled that the courts have a right to render the final decision on whether land sought to be condemned is to be used for a public purpose or a private purpose. *Zurn v. City of Chicago*, 389 Ill. 114, 59 N.E.2d 18 (1945).

■ Eminent domain refers to the power of the state to take private property. E. Meidinger, *The "Public Uses" of Eminent Domain: History & Policy*, 11 Envtl. L. 1, 2 (1980). Every private owner of property holds her title subject to the lawful exercise of the sovereign power of eminent domain. *Deerfield Park District v. Progress Development Corp.*, 22 Ill. 2d 132, 137, 174 N.E.2d 850, 853 (1961); *City of Chicago v. Boulevard Bank National Ass'n*, 293 Ill. App. 3d 767, 688 N.E.2d 844 (1997). Article I, section 15, of the 1970 Illinois Constitution and the fifth amendment to the United States Constitution prohibit the taking of private property for public use without just compensation. Ill. Const. 1970, art. I, § 15; U.S. Const., amend. V. The federal guarantee that private property shall not be taken for public use without just compensation is applicable to the states through the fourteenth amendment. *Chicago, Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 233-34, 41 L. Ed. 979, 983-84, 17 S. Ct. 581, 583-84 (1897).

In America, the first constitutions to use the words "public use" were those of Virginia and Pennsylvania in 1776. L. Berger, *The Public Use Requirement in Eminent Domain*, 57 Or. L. Rev. 203, 204 (1978). In the four decades following the adoption of the United States Constitution, there were two major kinds of activities for which the power to condemn was used: building roads and milldams. See P. Nichols, *The Meaning of Public Use in the Law of Eminent Domain*, 20 B.U. L. Rev. 615, 617 (1940). Roads are clearly used by the public. States authorized the erection of dams for gristmills, although the dams flooded land, because, as the mills were required by law to grind the grain of all comers, they were regarded as public utilities. 20 B.U. L. Rev. at 619.

The uses of eminent domain expanded as the economy expanded. In the 1840s and 1850s, eminent domain was used to condemn prop-

erty for the construction of railroads. The surge in industrial growth created a major drive to exploit western resources and open western markets. 11 Envtl. L. at 29. In the 20th century, the public-use clause has enabled governing bodies to further economic development, including the use of eminent domain to alleviate economic malaise. See *People ex rel. City of Urbana v. Paley*, 68 Ill. 2d 62, 368 N.E.2d 915 (1977); *City of Chicago v. Barnes*, 30 Ill. 2d 255, 195 N.E.2d 629 (1964).

Early on, the supreme court recognized that no specific formula exists for determining what is or is not a public use. In 1946, the supreme court stated in *People ex rel. Tuohy v. City of Chicago*, 394 Ill. 477, 481-82, 68 N.E.2d 761, 764 (1946), as follows:

"While from time to time, the courts have attempted to define public use, there is much disagreement as to its meaning. \*\*\*

\*\*\* The purpose may be highly beneficial to the public as well as to private interests; and, on the other hand, the use put to land acquired by private interests by eminent domain may be highly beneficial to the public, without giving the latter any control over the property taken.

The problem is rendered more complex by development arising since the adoption of the constitution, such as needs for acquiring property for social, medical[,] or health purposes, as well as for the application of new inventions which may be adapted to public use. Uses for purposes not contemplated at the time may be, and frequently are, declared by the legislature to be public uses for which the power of eminent domain may be properly used."

In *Tuohy*, 394 Ill. 477, 68 N.E.2d 761, the supreme court upheld a city ordinance that approved the condemnation and sale of land for the redevelopment of blighted or slum areas. Although the court recognized that the city cannot go into the real estate business under the guise of relieving slum conditions, the court held that acquiring land for the purpose of demolition and private sale is a public use and not a private one. The court held that the use of the power of eminent domain was amply justified under the circumstances. *Tuohy*, 394 Ill. at 487, 68 N.E.2d at 766-67. In reaching its decision, *Tuohy* discussed the criteria to be used in determining a public use. These criteria were: (1) the use should affect a community as distinguished from an individual, (2) the law should control the use to be made of the property, (3) the title so taken should not be invested in a person or corporation as private property to be used and controlled as private property, and (4) the public should reap the benefit of public possession and use and no one should exercise control except the municipality. *Tuohy*, 394 Ill. at 485, 68 N.E.2d at 766; see *Poole v. City of Kankakee*, 406 Ill. 521, 526, 94 N.E.2d 416, 419 (1950) (discussing *Tuohy*).

The supreme court, applying similar criteria, has upheld the exercise of eminent-domain power for many purposes: for off-street parking (*Poole v. City of Kankakee*, 406 Ill. 521, 94 N.E.2d 416 (1950)); for park purposes (*Deerfield Park District v. Progress Development Corp.*, 26 Ill. 2d 296, 186 N.E.2d 360 (1962)); to clear a slum and blighted area for redevelopment by private enterprise (*People ex rel. City of Urbana v. Paley*, 68 Ill. 2d 62, 368 N.E.2d 915 (1977); *City of Chicago v. Barnes*, 30 Ill. 2d 255, 195 N.E.2d 629 (1964)); for the creation of a local service drive to provide access to freeways (*Department of Public Works & Buildings v. Farina*, 29 Ill. 2d 474, 194 N.E.2d 209 (1963)); and for an auto service station and restaurant to be located adjacent to a toll highway (*Illinois Toll Highway Comm'n v. Eden Cemetery Ass'n*, 16 Ill. 2d 539, 158 N.E.2d 766 (1959)). In addition, a public use or purpose has been recognized in actions taking property for: school purposes (*Scheller v. Trustees of Schools of Township 41 North, Range 12 East of the Third Principal Meridian*, 67 Ill. App. 3d 857, 384 N.E.2d 971 (1978)); the construction and installation of a cable television system (*Lake Louise Improvement Ass'n v. Multimedia Cablevision of Oak Lawn, Inc.*, 157 Ill. App. 3d 713, 510 N.E.2d 982 (1987)), and the preservation of the natural beauty of areas through which state highways are constructed (*Department of Public Works & Buildings v. Keller*, 22 Ill. App. 3d 54, 316 N.E.2d 794 (1974), *aff'd*, 61 Ill. 2d 320, 335 N.E.2d 443 (1975)).

As disparate as these purposes are, it should be noted that none of them involve the taking of property from one private party and the immediate transfer of it to another private party, whose interest in the property is solely to earn greater profits. It is clear that each of the listed takings served a public purpose, which is at the heart of Locke's principle that governments were instituted to protect every person's property against the depredations of his neighbor. W. Stoebuck, *A General Theory of Eminent Domain*, 47 Wash. L. Rev. 553, 595 (1972).

The American colonists understood Locke's theory of representative government to apply to eminent domain. Locke theorized that private property could only be taken by consent—of the individual in person or by his governmental representatives consenting for him. 47 Wash. L. Rev. at 567. According to the principle of representational government, there is no compulsory taking but, rather, a voluntary relinquishment by delegated consent. 47 Wash. L. Rev. at 569. Locke's social-contract theory postulates as follows:

> "When men were in a simple state of nature, before government was formed, they enjoyed private property and personal liberty unhindered. As natural society became more complex, its members impinged upon each other, so that it became necessary to form

governments, the purpose of which was to preserve the private rights enjoyed in the state of nature. Government is a servant, necessary but evil, to which its subjects have surrendered only what they must, and that grudgingly. They recognize that government needs their money and other property to operate, but it would defeat the very purpose if government could extract a larger share from a subject than it needs to serve its purposes to him. \*\*\* \*\*\*

No claim is here made that Locke is right or wrong in any ultimate sense—only that his was the accepted theory of government in America when the American doctrine of eminent domain was being hammered out." 47 Wash. L. Rev. at 585-86.

Illinois cases have embodied the idea of a social contract by imposing a public-purpose limitation on the exercise of the eminent-domain power. Under the social contract in eminent-domain cases, the private landowner relinquishes her property to the government, and the public is likened to a third-party beneficiary, as it is the public who reaps the benefit of the bargain. Takings of private property are justified only where the third-party beneficiary is the public.

In this case, however, SWIDA's board of directors passed a resolution on March 5, 1998, agreeing to use its quick-take powers to acquire NCE's property on Gateway's behalf. Gateway's application was, in part, as follows:

**"APPLICATION FOR THE USE OF QUICK TAKE EMINENT DOMAIN**

**1)Applicant Information**

**Date**: February 20, 1998

**Applicant**: Gateway International Motorsports Corporation/ St. Clair County

\*\*\*

**2)The Development Project**

**Project Description**: Acquisition of tract of land described herein.

**Location (describe the general location of the project and attach map):**

Adjacent to 700 Raceway Blvd., Madison, IL

**Economic Development Impacts of Project (explain how the project will create or retain jobs, enhance or protect the tax base, etc.):**

*It is the further development of Gateway International track[,] creating and retaining jobs[,] and further increasing the value of the racetrack and its environs.*

**Status of Project:**

Inception.

**Funding for the Project (amount, source and status):**

Property is in the process of being appraised[,] and funds will come from Gateway International Motorsports Corporation and its parent corporation, Grand Prix Association of Long Beach, Inc.

**Urgency of Need (describe the timing of the project and why timely acquisition is necessary for its successful completion)**

The racing season commences in early spring[,] and more parking is necessary to adequately handle the crowd." (Emphasis added.)

It should be noted that the taking was conducted under SWIDA's quick-take application procedure, which charged an eminent-domain application fee of $2,500 for projects to be taken for *private use*. In addition, all attorney fees and costs of the condemnation proceedings incurred by SWIDA were paid by Gateway, as was the $900,000 quick-take amount.

Rod Wolter, president and general manager of Gateway International Raceway, testified that the raceway needs NCE's 148.5 acres for additional parking. Wolter testified that with the additional parking, Gateway would grow and profits would increase. Wolter acknowledged that it is less expensive to have the parking area at ground level than it is to have to build a parking garage.

Christopher Pook, chief executive officer of Grand Prix Association of Long Beach, California, testified that if Gateway had additional parking, it could host a Winston Cup race, which could gross $9 million. Pook testified that Gateway could also realize gains of $3 million to $4 million if it had the parking facilities needed to host two other major racing events. SWIDA contends that Gateway's development project would "enhance the public health, safety, morals, happiness, and the general welfare of the citizens of Southwestern Illinois through the creation of job opportunities, the generation of additional tax revenues[,] and the expansion of the tax base within St. Clair County." SWIDA contends that the public will benefit from this quick-take, and it submits that the testimony of several knowledgeable people supports this proposition.

John Baricevic, St. Clair County board chairman, testified that quick-take is necessary for this project because the county needs to develop the track to its economic potential for property taxes and jobs.

Alan Ortbals, SWIDA's executive director, testified that quick-take powers were needed in this case because of the economic-development importance of the project. Gateway initially contacted SWIDA for the purpose of acquiring the property to use as an additional parking area. Ortbals testified that in 1997 SWIDA changed its policy of not using its quick-take power for private entities, to a policy where it would use its quick-take power on behalf of private entities. In 1997 SWIDA used

its power to take the land of Carl Lukas and transfer it to Gateway. In exchange for SWIDA's assistance, Gateway paid SWIDA's costs and expenses in connection with the Lukas deal. Ortbals testified that quick-take was justified in the case at bar, as it was in the Lukas matter, because of the safety issues involved and to a lesser extent as a means of eliminating slums and blight.

As for the safety concerns, Ortbals testified that on days races are held, traffic is congested on the highway leading to the racetrack. In addition to this safety concern, Gateway would like to acquire additional parking so that pedestrians are not crossing a highway to get from the existing parking area to the racetrack. Ortbals testified, however, that to his knowledge no accidents have occurred in connection with the race-day traffic. Ortbals testified that due to the development of restaurants and motels in the area, Gateway customers will have fewer parking spaces. Gateway recently added 10,000 seats to its facility, and Gateway needs the additional 148.5 acres to satisfy the demand for parking.

Alan Ortbals testified that to his knowledge no studies have been commissioned by SWIDA to analyze the extent to which the tax base will be expanded by taking NCE's land. In addition, Ortbals testified that no particular studies have been made to support the theory that Gateway's expansion of its parking area will enhance employment prospects. Ortbals also testified that although there are no slums on the 148.5 acres, the taking of this land would have the indirect effect of eliminating any nearby slums.

Mike Pritchett, a design and planning engineer for the Illinois Department of Transportation in Collinsville, testified that his department is trying to devise a traffic plan to efficiently move traffic on race day with minimal impact on the highways. Pritchett testified that he believes that the acquisition of the 148.5 acres for additional parking will help alleviate the traffic safety problem but that it will not eliminate it. Pritchett also testified that a skyway could be constructed across the highway for pedestrian traffic and that would solve the problem of pedestrians crossing the highway to reach the raceway.

John Hamm, the mayor for the City of Madison, where Gateway is located, testified that Gateway has helped economic development in his city. He testified that Gateway has encouraged the Illinois Department of Transportation to help the City of Madison with road improvements. Hamm testified that the sales and entertainment taxes generated during race days has been significant as well.

Mark Westoff, the president of the Southwestern Illinois Tourism and Convention Bureau, testified that tourism is the second-largest industry in this eight-county area. Westoff estimated that in 1997

Gateway had an economic impact on the region of $43.4 million which otherwise would not have come into this region. Westoff testified that he hopes to see Gateway grow and continue to contribute to tourism in this region.

Rod Wolter, president and general manager of Gateway International Raceway, testified that Gateway intends to add additional seating to its facility in the fall of 1998. Wolter testified that Gateway continues to expand its list of events, which in turn will attract more people. He testified that 49 acres of land will accommodate 5,000 cars, which would greatly reduce Gateway's parking problem. Wolter testified that although Gateway could build a parking garage upon its existing land, Gateway rejected this idea because of the expense. Wolter agreed that it is less expensive to have SWIDA acquire ground from NCE than it would be for Gateway to build a parking garage. SWIDA argues that the taking of property for the redevelopment of a slum and blighted area is a taking for a public purpose and that the fact that a portion will be resold for development for private purposes does not render the condemnation invalid. SWIDA argues that Gateway's development of NCE's 148.5 acres will bolster tourism and the economy in the region. SWIDA admits that the primary thrust of this acquisition is not the elimination of slums and blight, but it contends that it is a valid incidental purpose. SWIDA cites the following cases in support of its position: *Village of Wheeling v. Exchange National Bank*, 213 Ill. App. 3d 325, 572 N.E.2d 966 (1991), *City of Chicago v. Walker*, 50 Ill. 2d 69, 277 N.E.2d 129 (1971), and *City of Chicago v. Gorham*, 80 Ill. App. 3d 496, 400 N.E.2d 42 (1980). These cases hold that the acquisition of slum and blighted areas for clearance and redevelopment is itself a taking for a public purpose, regardless of the subsequent use of the property. However, these cases are of little assistance in this case because we are not dealing with a taking to eliminate slums and blight. The evidence reveals that NCE presently utilizes the 148.5-acre tract in its business and anticipates using it to a greater extent as a landfill. Although this may not be the highest and best use of the property, such use does not render the land blighted.

Implicit in the cases cited by both parties is the principle that though land can be taken for a proper public use, taking private property for private use under the law of eminent domain is in direct contravention of article I, section 15, of the Illinois Constitution. The legislature's statement that SWIDA's purpose is, in part, to promote the public health, safety, morals, happiness, and general welfare of this state is entitled to respect. However this is not an urban-renewal case, nor is the taking a justifiable "public use." The expansion of Gateway parking is a private use, rather than a public use.

In this case we have no blight and no slum. NCE runs a recycling business for profit, and it utilizes the 148.5 acres as a part of its profit-making business. Coincidentally, the use of the 148.5 acres also confers a public benefit by acting as a landfill for our waste. Gateway operates a privately owned raceway for profit. Gateway International Raceway's president and general manager, Rod Wolter, testified that Gateway could build a parking garage to alleviate its parking problem but that it was less expensive to have SWIDA acquire the property and transfer it to Gateway. We have found no Illinois precedent to support the proposition that where a private enterprise admits it can use its own resources to develop its property (in this case by building a parking garage), a condemning authority is justified in using its power of eminent domain to take private property from an unwilling seller and to transfer it to another private enterprise to increase the profits of that enterprise. See *Reel v. City of Freeport*, 61 Ill. App. 2d 448, 209 N.E.2d 675 (1965).

The expansion of the raceway would undoubtedly increase revenues for the Gateway corporation. Likewise, Gateway's success would have the incidental effects of increasing revenues for other private enterprises in the area and of expanding the tax base of local municipalities. Notwithstanding any incidental economic benefit from SWIDA's actions in this case, we cannot subordinate a constitutional right to private corporate interests.

■ Eminent domain is an intrusive power, and the potential for its abuse is boundless. It is the function of the courts to give effect to the constitution. It is the courts' duty to enforce the constitutional limitation against taking private property by eminent domain except for public purposes. Although the term "public use" is flexible in an ever-changing society, the basic concept of private property does not change.

We have reviewed the record, the arguments submitted, and the law, and we determine that in this case, SWIDA exceeded its constitutional authority in taking NCE's land by eminent domain. Given our decision, we need not reach the other issues raised on appeal.

In conjunction with this appeal, on June 26, 1998, defendants NCE and St. Louis Auto filed a motion to hold SWIDA and Gateway in contempt for violating this court's order issuing a stay pending appeal and to award sanctions under Supreme Court Rule 375 (155 Ill. 2d R. 375). Defendants' motion alleged that despite this court's stay order, SWIDA and Gateway have begun clearing the land and taking actions that threaten to destroy the usefulness of NCE's property. Defendants alleged that SWIDA and Gateway have unloaded bulldozers, excavated roadways, cleared brush and timber, and dumped rock onto the prop-

erty. SWIDA and Gateway responded that they are not in contempt of this court's order because Gateway held title to the 148.5 acres before the stay was entered. We deny NCE's and St. Louis Auto's motion to hold SWIDA and Gateway in contempt.

Motion denied; reversed.

WELCH, J., concurs.

JUSTICE KUEHN, specially concurring:
This case is more troublesome than the majority opinion would seem to suggest. Staunch proponents for economic progress would quarrel with our essential judgment that the expansion of Gateway parking served a purely private, rather than public, purpose. They would argue that the legislature clearly contemplated eminent domain's use in the manner employed and foreordained that racetrack parking lots could serve a public purpose.

Because this seems apparent from the statute that created SWIDA and empowered it to act, we need to examine whether that statute rather than SWIDA's conduct in this case contravenes article I, section 15, of the Illinois Constitution.

SWIDA was created with one overriding goal in mind—to promote and facilitate economic progress in the southwestern part of Illinois. Lawmakers directed as follows:

> "It shall be the duty of [SWIDA] to promote development within the geographic confines of Madison and St. Clair counties. [SWIDA] *shall use the powers herein conferred upon it to assist in the development, construction[,] and acquisition of industrial, commercial, housing[,] or residential projects* within Madison and St. Clair counties." (Emphasis added.) 70 ILCS 520/5 (West 1996).

The legislature conferred eminent domain powers as one of the ways SWIDA could meet this mandate. It did not expect SWIDA to launch industrial, commercial, or housing projects as publicly owned and operated enterprises. Clearly, the power to condemn property was conferred to assist in land acquisition for development projects engaged in by private venture capital.

No one expected entrepreneurs who acquired land through SWIDA's condemnation powers to develop that land for public, rather than private, use. Legislators simply expected those entrepreneurs to develop the land in ways that would put people to work, enhance the economic landscape, improve the quality and enjoyment of life, and increase government's ability to provide services to the populace.

This was the planned public purpose SWIDA's eminent-domain

powers were designed to achieve. The aim was for industrial, commercial, and housing development by private investors to advance societal interests through the widespread economic impact that development would create. The social and economic advantages that private development would offer the public at large were deemed a proper vindication for land confiscation and ownership transfer. The legislature intended that individual property rights yield to this greater good. SWIDA's eminent-domain powers were thus conferred to promote the legislature's quintessential public purpose—advancement of the region's overall economic health.

When they granted SWIDA eminent-domain powers, legislators fully expected SWIDA to take private property from unwilling sellers and convey it to private developers. There was no other reason to confer those powers. Municipal and county governments could already exercise eminent domain for all other reasons. Moreover, legislators harbored no illusion that the developers who benefited from government-assisted land acquisition would be motivated by anything other than personal gain and profit. Clearly, the law that created SWIDA contemplated the precise action taken by SWIDA in this case.

This intent is apparent from the specific examples of commercial projects that SWIDA was to promote with the exercise of its eminent-domain powers:

> "[A]ny project, including *** any cultural facilities of a *for-profit* *** type including but not limited to *** *racetracks*, stadiums, convention centers, exhibition halls, arenas, opera houses and theaters, *** restaurants, velodromes, coliseums, sports[-]training facilities, *parking facilities*, *** and port facilities." (Emphasis added.) 70 ILCS 520/3 (West 1996).

SWIDA acted as it was authorized and intended to act. It used eminent domain to promote a commercial project as that term was defined by our legislature. It facilitated the acquisition of land for a parking lot that would enhance a racetrack enterprise that offers unquestionable economic boon to the region. The social and economic advancement that a privately operated racetrack in need of parking facilities could generate was the legislature's public-purpose justification for eminent-domain action.

Therefore, SWIDA had the authority to exercise the right of eminent domain in the manner employed, and the power's use was constitutional *if the statute that conveyed the power and intended such manner of use comports with the constitution.* Since SWIDA's actions fit our legislature's design, we should address the legislative determination that economic development and advancement is a public purpose sufficient to validate the use of eminent-domain powers. If

such determination is constitutionally sound, SWIDA was empowered to do what it did.

Whether economic development and advancement constitutes a valid reason to take private property and convey it to different private interests is a question under current debate in all quarters of the country. See D. Starkman, *Take and Give: Condemnation Is Used to Hand One Business Property of Another*, Wall St. J., Dec. 2, 1998, at A1. The more precise question is whether legislation can constitutionally authorize a government agency to take an owner's land and make it the private property of a new owner because the new owner is capable of putting the land to a more productive use and/or a use that better serves the broader social or economic interests of the public at large. Until this question is resolved, owners of land next to private enterprises that attract people and make money, enterprises like casinos and racetracks, will continue to relinquish their ownership rights to the social and economic progress that a private parking lot can define.

Our pagination rules limit extensive scrutiny of this question. Nonetheless, its answer seems simple enough. If property ownership is to remain what our forefathers intended it to be, if it is to remain a part of the liberty we cherish, the economic by-products of a private capitalist's ability to develop land cannot justify a surrender of ownership to eminent domain. If a government agency can decide property ownership solely upon its view of who would put that property to more productive or attractive use, the inalienable right to own and enjoy property to the exclusion of others will pass to a privileged few who constitute society's elite. The rich may not inherit the earth, but they most assuredly will inherit the means to acquire any part of it they desire.

The attraction of private venture capital is a worthy public goal, and the legislature provided SWIDA with numerous ways to accomplish it. While this legislation offers unquestionable potential for the kind of social and economic advancement that follows capital investment, it exceeds sacred parameters when it empowers SWIDA to lure private investors with the promise of any prime land those investors want to take.

This part of SWIDA's statutory power offers dubious progress. It is, after all, akin to the tyranny our forefathers fled. Our heritage stems in part from the aversion to the King's use of property to convey favor upon a privileged nobility. It betrays that heritage to rekindle the practice.

Article I, section 15, of the Illinois Constitution forbids eminent domain's exercise for private use. Because I do not believe that eco-

nomic development constitutes a public purpose that can vindicate eminent domain's use to assist private developers, I think that SWIDA's condemnation powers contravene this constitutional imperative. For this reason, I specially concur. I also concur in the denial of the motion for contempt.