THE DEPARTMENT OF TRANSPORTATION, Plaintiff-Appellee, v. SUNNYSIDE PARTNERSHIP, L.P., Defendant-Appellant.

Fifth District No. 5—02—0434

Opinion filed February 20, 2003.

324

Barry Levenstam, Jeremy M. Taylor, and John W. Joyce, all of Jenner & Block, L.L.C., of Chicago, and Daniel Schattnik, of Unsell, Unsell, Schattnik & Hale, of East Alton, for appellant.

James E. Ryan, Attorney General, of Chicago (Michael J. Luke, Assistant Attorney General, of counsel), Philip B. Alfeld, Special Assistant Attorney General, of Alton, and M. Joseph Hill, Special Assistant Attorney General, of Edwardsville, for appellee.

JUSTICE KUEHN delivered the opinion of the court:

By Supreme Court Rule 307(a)(7) (166 Ill. 2d R. 307(a)(7)), The Sunnyside Partnership, L.P. (Sunnyside), files this interlocutory appeal as of right from the trial court's June 7, 2002, order finding that the Illinois Department of Transportation (IDOT) has the authority to exercise the right of eminent domain over property owned by Sunnyside, that Sunnyside's property is subject to IDOT's exercise of eminent domain, and that IDOT is not improperly exercising its right of eminent domain. We affirm.

## FACTS

Sunnyside owns an 80-acre nursery in Glen Carbon, Illinois. The nursery has been in the Foucek family for approximately 60 years. The nursery is located just west of Highway 159—a road that runs in a north-south direction in that area. The land has been farmed for more than 200 years. In recent years, the area surrounding the nursery has become rather extensively, commercially developed.

For 40 years, there has been discussion about possible road construction across a portion of the nursery. IDOT's initial conception was a project labeled the "South Bypass." That bypass would not have stopped at Highway 159 but would have gone some miles past it. The bypass project contemplated taking the same nursery land sought in this case. Environmental studies were conducted, and much land was obtained by purchase, although the nursery land was not included in what was purchased. However, funding for the project never fully materialized, and IDOT abandoned its bypass plans.

Highway 159 is a state highway that, in part, traverses Glen Carbon and Edwardsville. That corridor has been the sight of incredible expansion in recent years. That growth has resulted in renewed interest in road projects in the area. During 1995 and 1996, IDOT decided that it was necessary to relocate Highway 159 to the west, running parallel to the existing Highway 159. This relocation was deemed necessary to ease traffic congestion. The relocated Highway 159 will abut the west side of the Sunnyside nursery.

The relocation plans include four roads that will connect old Highway 159 with new Highway 159. One of these roads, Center Grove Road, is located approximately 2,000 feet south of the nursery property at issue in this case. Early in its highway relocation planning, IDOT investigated the possibility of constructing an additional connector road—called the "East-West Connector." Several options were considered, studied, and rejected. Finally, IDOT settled upon a location that ran between the nursery and land owned by Madison County. This property line alignment became known as the "K mart align-

ment," because of its alignment with the entrance to a K mart shopping center on the opposite side of old Highway 159. IDOT sought and obtained design approval for this K mart alignment.

While IDOT felt that the decision was complete, Madison County and the City of Edwardsville maintained larger-scale plans for this connector road. They wanted to resurrect the bypass option originally contemplated 40 years ago. Constructing a bypass would also greatly serve to alleviate traffic congestion. They met with IDOT officials and sought to have this alignment road constructed in the location originally considered for the bypass, south of the proposed K mart alignment and directly through the nursery property. The Madison County property would not abut or otherwise have direct access to this newly proposed connector road.

IDOT was willing to be involved with this project but did not want the project identified as a bypass. IDOT's agreement was related to a connector road and not a full bypass. The foundation for IDOT's concern is unknown. Perhaps IDOT's trepidation was grounded in the fact that its environmental studies were now 40 years old and would have to be completely redone in order for IDOT to participate in the bypass project. Perhaps IDOT lacked the funding to fully participate in the bypass project. We do not know the reason, but we do know that IDOT required the omission of the word "bypass" from documentation relative to this connector road. IDOT required written concurrences regarding the project change. IDOT needed concurrences from the Village of Glen Carbon and the City of Edwardsville, as well as from Madison County. All three entities expressed their concurrences with reference to the bypass project. IDOT asked all three entities to rewrite the concurrences and omit the word "bypass" and substitute the word "connector." All three entities resubmitted revised concurrences in keeping with IDOT's wishes.

While Madison County and the City of Edwardsville desired this major change in the IDOT project, neither the county nor the city had legislatively granted quick-take power, and so neither of them could have taken the property from Sunnyside if Sunnyside was unwilling to sell. IDOT did have quick-take authority. Sunnyside was unwilling to sell. IDOT was forced to exercise its quick-take power.

By agreement, after IDOT completes the construction of this connector road, IDOT will turn the road over to the county so that Madison County remains responsible for all necessary maintenance. Testimony adduced at the hearing explained that transferring the road to county control made sense in light of the fact that the remainder of the bypass project, after completion, would be owned and maintained by Madison County.

The Madison County land that would have been impacted by the K mart alignment will now be isolated from the connector-road project. After IDOT finalized its plans to move the connector road from the K mart alignment to the location through the Sunnyside nursery, the City of Edwardsville and Madison County teamed up in an intergovernmental agreement to market and sell this property to private real estate developers.

On February 14, 2002, IDOT filed its complaint for condemnation. On March 1, 2002, IDOT also filed a quick-take motion seeking the immediate vesting of title to the property. IDOT filed an essentially identical motion on March 12, 2002. On March 7, 2002, Sunnyside filed a traverse and motion to dismiss raising numerous issues. Those issues were taken up by the court at the quick-take hearing, which began on May 28, 2002. Nine witnesses, including representatives of IDOT, Madison County, the City of Edwardsville, and the Village of Glen Carbon, as well as Joanne Foucek, Sunnyside's sole living partner, testified at the hearing. On June 7, 2002, the circuit court denied Sunnyside's motion, found that IDOT had the authority to take the nursery property, and concluded that IDOT had properly exercised its authority.

Sunnyside appealed this order and sought a stay of proceedings in the circuit court. The circuit court denied Sunnyside's motion. Sunnyside then asked this court to stay the proceedings. We granted that motion on July 24, 2002.

## EMINENT DOMAIN AND QUICK-TAKE LAW IN GENERAL

■ "Eminent domain" is a term that refers to the state's power to take private property. *Southwestern Illinois Development Authority v. National City Environmental, L.L.C.*, 304 Ill. App. 3d 542, 546, 710 N.E.2d 896, 899 (1999) (citing E. Meidinger, *The "Public Uses" of Eminent Domain: History & Policy*, 11 Envtl. L. 1, 2 (1980)), *aff'd*, 199 Ill. 2d 225, 768 N.E.2d 1 (2002). Our state and federal constitutions prohibit the taking of private property for public use without just compensation. Ill. Const. 1970, art. I, § 15; U.S. Const., amends. V, XIV. Throughout our country's history, our governments have taken land primarily for the construction of roads and dams. *Southwestern Illinois Development Authority*, 304 Ill. App. 3d at 546, 710 N.E.2d at 900. Over the years, the use of eminent domain expanded as our country's needs expanded. See *Southwestern Illinois Development Authority*, 304 Ill. App. 3d at 546-47, 710 N.E.2d at 900.

■ The legislature has granted IDOT the following eminent domain power:

"[IDOT] *** may acquire the fee simple title *** to any land ***

necessary for the construction, maintenance[,] or operation of State highways, or necessary for locating, relocating, extending, widening[,] or straightening any State highway, or necessary for locating, relocating, extending, widening[,] or straightening an existing street or for laying out, establishing[,] or opening a new street within the corporate limits of any municipality which has been designated by [IDOT] as a street to form a part of or to connect with a State highway leading up to the corporate limits of such municipality, or necessary for any other purpose or use contemplated by this Code by purchase or by the exercise of the right of eminent domain under the eminent domain laws of this State ***." 605 ILCS 5/4—501 (West 2000).

Furthermore, the legislature has authorized the State of Illinois to use quick-take proceedings "for the acquisition of land or interests therein for highway purposes." 735 ILCS 5/7—103.1 (West 2000).

█ Our Code of Civil Procedure sets forth the following necessary steps in a quick-take proceeding:

"In a proceeding subject to this Section, the plaintiff, at any time after the complaint has been filed and before judgment is entered in the proceeding, may file a written motion requesting that, immediately or at some specified later date, the plaintiff either be vested with the fee simple title (or such lesser estate, interest[,] or easement, as may be required) to the real property, or specified portion thereof, which is the subject of the proceeding, and be authorized to take possession of and use such property[,] or only be authorized to take possession of and to use such property, if such possession and use, without the vesting of title, are sufficient to permit the plaintiff to proceed with the project until the final ascertainment of compensation ***." 735 ILCS 5/7—103(b) (West 2000).

In order to take possession of land of this type, pursuant to this quick-take power, the plaintiff is required to file a motion including the following:

"(1) an accurate description of the property to which the motion relates and the estate or interest sought to be acquired therein; (2) the formally adopted schedule or plan of operation for the execution of the plaintiff's project; (3) the situation of the property to which the motion relates, with respect to the schedule or plan; [and] (4) the necessity for taking such property in the manner requested in the motion." 735 ILCS 5/7—103(b) (West 2000).

█ The next step in the quick-take process is a hearing at which time the trial judge must make the following determinations: "that the plaintiff has authority to exercise the right of eminent domain, that the property sought to be taken is subject to the exercise of such

right, and that such right is not being improperly exercised in the particular proceeding." 735 ILCS 5/7—104(b) (West 2000). Following this hearing, the trial court must determine that there is a reasonable necessity for taking the property, and if so, then it must make a preliminary finding of just compensation for the property. 735 ILCS 5/7—104(c) (West 2000).

## ISSUES

Sunnyside raises the following issues on appeal:

1. Whether IDOT abused its quick-take authority by permitting that authority to be exercised by parties not entrusted by the General Assembly with quick-take authority.

2. Whether IDOT abused its authority by permitting its quick-take authority to be exercised for the profit of those parties exercising the authority in this instance.

3. Whether the circuit court erred in permitting IDOT to quick-take property that was not necessary for the intended purpose.

4. Whether IDOT's decision to treat Sunnyside in a manner different from that accorded all other public and private landowners violated Sunnyside's equal protection rights.

5. Whether IDOT's actions run afoul of due process requirements where IDOT partnered with Madison County and the City of Edwardsville in deciding to take Sunnyside's property, despite the fact that Madison County and Edwardsville had a direct financial stake in the decision.

6. Whether IDOT violated this state's farmland preservation laws by attempting to convert Sunnyside's farmland to another use without first having complied with its own regulations and the Illinois Farmland Preservation Act (Act) (505 ILCS 75/1 et seq. (West 2000)).

7. Whether the circuit court erred in permitting IDOT to proceed under quick-take procedures where IDOT has no immediate need for the land it is seeking to condemn.

For brevity in our opinion, we have combined some of these issues in our analysis thereof.

## STANDARD OF REVIEW

■ The issues raised by Sunnyside relative to the quick-take action at issue are reviewed with a manifest-weight standard. *Southwestern Illinois Developmental Authority v. Al-Muhajirum*, 318 Ill. App. 3d 1005, 1007-08, 744 N.E.2d 308, 310 (2001). A decision is only against the manifest weight of the evidence if the opposite result is clearly evident, plain, or indisputable from a review of the evidence. *File v. D&L Landfill, Inc.*, 219 Ill. App. 3d 897, 901, 579 N.E.2d 1228, 1232 (1991).

## IDOT's Abuse of Its Quick-Take Authority

■ Sunnyside's initial argument is that IDOT did not exercise its quick-take authority on its own behalf—instead, exercising the power on behalf of Madison County and the City of Edwardsville, neither of which had the power to take the land on its own. Sunnyside does not specifically dispute that IDOT maintains the power to do what it did, at least if it involves its own projects. Our legislature has clearly empowered IDOT with quick-take power. See 605 ILCS 5/4—501 (West 2000); 735 ILCS 5/7—103.1 (West 2000).

After analyzing the briefs, records on appeal, and argument of counsel, we fail to find merit to Sunnyside's argument. This was an IDOT project. The project was funded by the Illinois state legislature. The plan for a connector road has been in the works since 1995. The alternate Highway 159 and its connector roads were planned to enhance the flow of traffic and to relieve traffic congestion in that area. The public will clearly benefit from the addition of the connector road. The fact that the connector road would be turned back over to Madison County upon completion is standard IDOT procedure and fails to rise to the level of a conspiracy. The project is one that was designed by IDOT, albeit with input from the Village of Glen Carbon, the City of Edwardsville, and Madison County. Input from other governmental entities is not only proper but almost rises to the level of a requirement. 605 ILCS 5/4—101.10 (West 2000).

Additionally, we fail to understand how the taking of Sunnyside's property is for anything other than a public purpose. The project is for a connector road to be utilized by the general public. The road is to be constructed through Sunnyside's land, effectively bisecting the parcel. Once the connector road is completed, Sunnyside's land will front both sides of the connector road. The land at issue in this argument is owned by Madison County. Madison County's land would have fronted the connector road given the original design, but it will not have direct access to the connector road in the present design. The fact that Madison County and the City of Edwardsville teamed up to sell this land after the connector-road plan was finalized fails to establish an inappropriate scheme.

## Property Necessary for the Intended and Immediate Purposes

■ Sunnyside argues that there are going to be other connector roads between old and new Highway 159 and that, therefore, this plan is unnecessary. Obviously, there will be other connector roads, but that fact does not mitigate the need for or appropriateness of an additional connector road. Testimony supported the need for an additional connector road because of the traffic flow and congestion

problems. Differing opinions of engineers on the location of a road are not unusual and do not render the resulting plan incorrect. A decision with respect to alternate design plans is not a matter for judicial determination. *Department of Transportation v. Keller*, 127 Ill. App. 3d 976, 980-81, 469 N.E.2d 262, 266 (1984).

While we arguably lack jurisdiction to consider the issue of necessity raised by Sunnyside, because that issue is only appealable at the conclusion of the eminent domain proceeding (see *Southwestern Illinois Development Authority v. Vollman*, 235 Ill. App. 3d 32, 37, 600 N.E.2d 926, 929 (1992)), we conclude that IDOT met its burden of establishing that the project was "necessary," when it outlined its reasons for the public project. Initially considering, and ultimately rejecting, alternate sites is not relevant to the determination of the necessity of the project.

Regarding the immediacy of IDOT's need for Sunnyside's property, we again note that the connector road has always been a part of the overall highway relocation plan. The location of the connector road has fluctuated but does not bear upon the immediacy of the need. From an engineering point of view, IDOT presented testimony that there was a need for the connector road to be constructed somewhat contemporaneously with the relocated highway. Testimony established that the relocation project is going to be let out on bids in sections, and therefore, the fact that IDOT has already let out one portion of the project before securing Sunnyside's land is irrelevant to the issue of immediacy. Also irrelevant is the fact that Madison County is still working to secure all necessary funding for the larger bypass project, because the connector road remains necessary irrespective of the future of the bypass project.

### Sunnyside's Equal Protection and Due Process Rights

Sunnyside makes two related equal protection arguments.

■ Sunnyside initially argues that changing the location of the connector road at the requests of Madison County and the City of Edwardsville impairs its private interests to the benefit of the public property interest. This argument lacks merit because the connector road does have a useful purpose at its presently planned location. The alternate location which would have impacted both Sunnyside and Madison County was not supported at the hearing with evidence that it was the better location. In fact, IDOT presented testimony that the connector road at issue made perfect engineering sense. Overall, IDOT laid out a rational reason for moving the planned location of the road. Sunnyside's ownership of a parcel of land large enough to encompass the entire connector-road project does not transform IDOT's plan into an illogical one.

■ Sunnyside also argues that IDOT treated it on an individual basis because of its previous consideration of other locations, which would have impacted both public and private concerns. In arguing this point, Sunnyside returns to the same argument dispensed above—that IDOT was attempting to locate this connector road in an area that was not the most suitable to its needs. This argument, too, is meritless.

Sunnyside's due process argument centers on civil conspiracy, arguing that financially interested governmental bodies should not be allowed to make condemnation decisions. Sunnyside's assertion stretches the evidence adduced at the hearing. To make this argument, Sunnyside maintains that IDOT had scant involvement in the decision to place the road wholly upon Sunnyside land. While it is true that Madison County and the City of Edwardsville requested that IDOT alter its plans, IDOT did so after the consideration of all relevant engineering matters. IDOT's revised plan occurred because IDOT's engineers determined that this new location made perfect "sense." The allegation that Madison County and the City of Edwardsville conspired with each other is merely an allegation. Sunnyside presented no evidence that the governmental entities stood to profit from the relocation of the project. If anything, it would seem that the value of Madison County's land would decrease because it would now not front the connector road. There was no evidence presented on this point either.

We find no basis to conclude that Sunnyside's equal protection and due process rights were violated in this matter.

## Farmland Preservation Act

Sunnyside raised an issue in its motion to dismiss but did not argue it before the trial court. While the issue may have been preserved by its mere mention in the motion (see *Mackereth v. G.D. Searle & Co.*, 285 Ill. App. 3d 1070, 1077-78, 674 N.E.2d 936, 941 (1996)), it is not clear whether or not the trial court addressed the issue. We assume that the trial court considered and rejected this argument.

■ Agricultural land is protected under Illinois law. 505 ILCS 75/1 *et seq.* (West 2000). The Farmland Preservation Act states, "Protection of the State's natural resources is essential to guard the public health, safety, and welfare[ ] and to assure an adequate natural resource supply and quality for use and enjoyment by future generations." 505 ILCS 75/2 (West 2000). That section goes on to state that the conversion of farmland "to urban development and other non[ ]farm uses reduces future food production capability and may

ultimately undermine agriculture as a major economic activity in Illinois." 505 ILCS 75/2 (West 2000). The statute makes no reference to trees as an agricultural product and offers no desire to specifically protect tree farms. IDOT serves as a member of an interagency committee on farmland preservation. 505 ILCS 75/3 (West 2000). Each agency member of this committee was required to adopt a working agreement relative to how the agency intended to handle situations impacting farmland. 505 ILCS 75/4 (West 2000). IDOT has such a working agreement. IDOT's working agreement requires it to notify the Department of Agriculture in writing of projects that will impact Illinois farmland. 8 Ill. Adm. Code § 700, app. I (2000). This notification must occur prior to the holding of public hearings about the project. The Farmland Preservation Act sets forth a procedure by which farmland is to be converted to nonagricultural purposes. 505 ILCS 75/5 (West 2000). Unless there is an exception carved out in the administrative agency's working agreement, the process involves obtaining a determination from the Director of Agriculture of whether or not the project is within compliance with IDOT's policy statements and working agreements. 505 ILCS 75/5 (West 2000). This determination is within the power of the Director of Agriculture. Furthermore, the provisions of the Farmland Preservation Act are to be administered by the Department of Agriculture. 505 ILCS 75/6 (West 2000). There is no mention of court involvement in the Farmland Preservation Act.

No cases have ever interpreted the Farmland Preservation Act. One case references its predecessor. In *Department of Transportation v. Keller*, this court held that while the legislature indicated its "manifest desire to preserve agricultural land," that intent was not a barrier to eminent domain simply because the land at issue was agricultural in designation. *Keller*, 127 Ill. App. 3d at 979, 469 N.E.2d at 265.

█ In this case, IDOT determined that coordination with the Department of Agriculture was not required. Consequently, the Department of Agriculture was not notified of this project. While no one seems to dispute the designation of Sunnyside's land as farmland, we agree with IDOT that compliance with the Farmland Preservation Act and IDOT's own working agreement was not necessary, because this "farm" is not the type of land that the Act was created to protect. By the Act's own language, the concern about the erosion of farmland in this state involved the elimination of sources of food products. 505 ILCS 75/2 (West 2000). The land at issue has not been utilized for food production for the duration of the Foucek family ownership— approximately 60 years.

Furthermore, the Farmland Preservation Act is designed to be

administered by the Department of Agriculture. Even if Sunnyside had standing to raise matters properly the concern of the Department of Agriculture, involvement by the courts is not contemplated by the Farmland Preservation Act.

This argument fails.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Madison County is hereby affirmed.

Affirmed.

GOLDENHERSH and DONOVAN, JJ., concur.