Docket No. 87809–Agenda 16–September 2001.

THE SOUTHWESTERN ILLINOIS DEVELOPMENT AUTHORITY, Appellant, v. NATIONAL CITY

 ENVIRONMENTAL, L.L.C., 
et al
., Appellees.

Opinion filed April 4, 2002.

JUSTICE GARMAN delivered the opinion of the court:

The issue in this case is whether the Southwestern Illinois Development Authority (SWIDA) properly exercised the power of eminent domain to take property owned by National City Environmental, L.L.C., and St. Louis Auto Shredding Company (collectively NCE), and convey that property to Gateway International Motorsports Corporation (Gateway). The circuit court of St. Clair County ruled that SWIDA had properly exercised its authority to take the land in question. The appellate court reversed. 304 Ill. App. 3d 542. On April 19, 2001, we reversed the decision of the appellate court, but subsequently granted rehearing. We now affirm the decision of the appellate court.

BACKGROUND

SWIDA was created in 1987 by the Illinois General Assembly through passage of the Southwestern Illinois Development Authority Act (the Act) (70 ILCS 520/1 
et seq.
 (West 1998) (formerly Ill. Rev. Stat. 1991, ch. 85, par. 6151 
et seq.
)). SWIDA is a political entity and municipal corporation whose stated purpose is to “promote industrial, commercial, residential, service, transportation and recreational activities and facilities, thereby reducing the evils attendant upon unemployment and enhancing the public health, safety, morals, happiness and general welfare of this State.” 70 ILCS 520/2(g) (West 1998).

The Act mandates that SWIDA “promote development within the geographic confines of Madison and St. Clair counties.” 70 ILCS 520/5 (West 1998). It is the duty of SWIDA to assist in the development, construction, and acquisition of industrial, commercial, housing or residential projects within these counties. 70 ILCS 520/5 (West 1998). A “[c]ommercial project” is defined as “any cultural facilities of a for-profit or not-for-profit type including *** racetracks *** [and] parking facilities.” 70 ILCS 520/3(j) (West 1998).

To accomplish the purposes of the Act, the legislature empowered SWIDA to issue bonds for the purpose of acquiring, improving or developing projects, including those established by business entities attempting to locate or expand property within Madison and St. Clair Counties. 70 ILCS 520/7 (West 1998). SWIDA also has the authority to acquire property by condemnation. According to the Act, SWIDA’s “acquisition by eminent domain of such real property or any interest therein by [SWIDA] shall be in the manner provided by the ‘Code of Civil Procedure’ [735 ILCS 5/1–101 
et seq.
 (West 1998)], *** including Section 7–103 thereof [735 ILCS 5/7–103 (West 1998)].” 70 ILCS 520/8(b) (West 1998).

In June 1996, SWIDA issued $21.5 million in taxable sports facility revenue bonds. The proceeds of the bonds were lent to Gateway to finance the development of a multipurpose automotive sports and training facility in the region (the racetrack). Gateway signed a loan agreement and a note to evince its obligation to repay the loan. Revenues received by SWIDA pursuant to the loan agreement are pledged to secure payment of the bonds. 70 ILCS 520/7(d) (West 1998). If at any time SWIDA is unable to pay the principal and interest on the bonds, it shall so certify to the Governor, who then submits the amounts so certified to the General Assembly. As such, the bonds constitute a moral obligation of the state. 70 ILCS 520/7(f) (West 1998).

The racetrack was developed and has flourished. In 1997, the racetrack had a total attendance of 400,000 at various large and small events. Seating included 25,000 grandstand seats and 25,000 portable seats. In 1998, Gateway increased its seating capacity and desired to increase its parking capacity as well. It called upon SWIDA to use its quick-take eminent domain powers to acquire land to the west of the racetrack for the purposes of expanded parking facilities. The adjacent 148.5 acre tract of land sought was owned by NCE.

NCE operates a metal recycling center in an area of St. Clair County that, until recently, was National City, Illinois. NCE employs 80 to 100 persons full time and has been at its present location since 1975. NCE shreds cars and appliances and separates the reusable metals. It disposes of nearly 100,000 cars per year. Nonrecyclable by-products of the process, referred to as “fluff,” are deposited in NCE’s landfill, located to the east of its recycling center. When this landfill site reaches capacity, NCE plans to expand its landfill operations onto the 148.5 acre tract of land it owns to the east of the current landfill. NCE uses clay and dirt from the 148.5 acre tract to fill and cover fluff in the landfill area currently in use.

In early 1998, Gateway attempted to discuss the purchase of NCE’s land with NCE’s owner. NCE would not discuss the matter and, initially, Gateway made no offer to purchase the land. Instead, Gateway asked SWIDA to exercise its quick-take eminent domain powers to take the 148.5 acres of land and transfer it to Gateway.

Gateway completed a “Quick-Take Application Packet” and stated that it wanted to use the land as a parking lot for the purpose of increasing the value of Gateway’s racetrack. Gateway paid SWIDA an application fee of $2,500, and the sum of $10,000 to be applied toward SWIDA’s sliding scale fee of 6% to 10% of the acquisition price of property being condemned. In addition, Gateway agreed to pay SWIDA’s expenses, including the acquisition price of the property, and other costs associated with the quick-take process.

Approval of the county board is required before SWIDA can use its quick-take eminent domain powers within unincorporated areas of a county. 70 ILCS 520/8(b) (West 1998). On February 23, 1998, the St. Clair County board adopted a resolution authorizing SWIDA to exercise its quick-take eminent domain authority to acquire the NCE tract of land for Gateway parking. The board noted that dramatic attendance increases could be expected at the racetrack and that it was necessary to create additional parking facilities to adequately serve patrons. The board also found that expansion of the racetrack facilities would enhance the public health, safety, morals, happiness, and general welfare of the citizens of southwestern Illinois by increasing the tax base in the area and generating additional tax revenues.

On March 5, 1998, SWIDA held a public meeting to address the proposed taking. Notice was given to NCE and adjacent property owners. Over the objections of NCE’s counsel, SWIDA adopted a resolution manifesting an intent to assist Gateway with racetrack expansion through the acquisition of NCE’s property. Like the St. Clair County board resolution, SWIDA’s resolution recounted the numerous benefits that could be created for the region. SWIDA found that the acquisition of NCE’s property was essential to the success of the proposed expansion and further development of the racetrack, and authorized its executive director, Alan Ortbals, to acquire title to the property by all necessary and appropriate means, including negotiations and quick-take eminent domain proceedings. SWIDA authorized the execution of an agreement with Gateway for acquisition of the property through quick-take eminent domain proceedings and subsequent conveyance of the property to Gateway.

In an effort to acquire the property through a negotiated sale, Ortbals attended a meeting on March 17, 1998, at which he delivered to NCE a written offer to purchase the property for $1 million. By letter dated March 19, 1998, NCE rejected the $1 million offer but indicated its willingness to meet with SWIDA the week of March 30, 1998, following an expected appraisal of the property. On March 20, 1998, SWIDA made another written offer to NCE to purchase the property for $1 million and advised NCE that SWIDA would initiate proceedings to condemn the property if NCE did not accept the offer by 5 p.m. on March 30, 1998.

NCE did not respond to the second offer and ultimatum until April 20, 1998. By letter, NCE indicated that it felt it was unnecessary to respond to the offer, as SWIDA was aware of NCE’s prior rejection of the earlier offer to purchase the property for the identical sum of $1 million. However, to be clear on the matter, NCE indicated that it was again rejecting the offer of $1 million for the sale of its property.

Meanwhile, on March 31, 1998, SWIDA filed a complaint in the circuit court of St. Clair County seeking condemnation of, and acquisition of fee simple title to, the property. In addition, SWIDA filed a motion for immediate vesting of title, and asked the circuit court to fix a date for quick-take proceedings pursuant to sections 7–103 and 7–104 of the Code of Civil Procedure (735 ILCS 5/7–103, 7–104 (West 1998)). On the same date, NCE filed a motion to dismiss the complaint and on April 2, 1998, filed a traverse and motion to dismiss. NCE argued that the proposed taking was for an unconstitutional private use; the proposed taking was excessive; additional parking at Gateway’s racetrack was not needed; and SWIDA had failed to make a good-faith effort to negotiate an acceptable purchase price with NCE. In addition, NCE filed a motion to strike SWIDA’s request for immediate vesting of title. The circuit court denied both the motion to dismiss and the motion to strike the request for immediate vesting of title.

The circuit court held a quick-take hearing and on April 27, 1998, ruled in SWIDA’s favor. Relying on testimony from Mike Pritchett of the Illinois Department of Transportation (the Department), the circuit court found that the taking was for a public purpose as there were serious public safety issues involved. Pritchett had testified that the Department was working with Gateway to develop a traffic plan that would move traffic into and out of the racetrack facility, while minimizing impact on the surrounding state and interstate highways. According to traffic pattern data studied by the Department, significant traffic congestion occurred on Interstate 55-70 when major events were held at the racetrack. According to Pritchett, a safety hazard was created because drivers do not normally anticipate stopped traffic on the interstate. Pritchett further testified that pedestrians often crossed Illinois Route 203 from the parking areas east of the highway to the racetrack. A traffic signal was in place to allow patrons to cross Route 203. However, the signals created even more automobile traffic delays. There was additional testimony that there was a risk pedestrians would be struck by automobile traffic as they crossed Route 203 at improper locations away from the designated crossing area and signal. Pritchett testified that construction of a parking lot on NCE’s property, as suggested in the Department’s 1996 traffic impact study, would provide parking to the west of the racetrack and alleviate traffic problems when major events were taking place at the racetrack. Therefore, according to Pritchett, there was some urgency in acquiring the property and developing parking facilities to alleviate stress on the highway system and improve safety.

The circuit court also relied on Ortbals’ testimony regarding public safety, economic development, and elimination of blight. According to Ortbals, the county was experiencing serious traffic problems on days the racetrack hosted events. Like Pritchett, Ortbals also referred to congestion on Interstate 55-70 and traffic and pedestrian concerns related to Illinois Route 203. In addition, Ortbals testified that development of a parking facility on the property was necessary to promote economic development, as the number of spectators, development and expansion of neighboring businesses, and other economic spin-off, all had exceeded initial expectations. Ortbals testified that it was necessary to acquire the entire 148.5 acre tract owned by NCE because areas that had previously been used for patron parking, such as areas now occupied by hotels and restaurants and the golf course, were no longer available. In addition, Ortbals testified that the development of the racing facilities had indirectly helped to eliminate blight in the area.

Rod Wolter, president and general manager of Gateway International Raceway, testified that by turning the 148.5 acres owned by NCE into parking for the racetrack, Gateway would grow and profits would increase. Wolter acknowledged that Gateway had discussed developing a parking garage facility to meet its needs but that it would be much less expensive to have SWIDA take the property in question from NCE and give it to Gateway for ground parking.

The circuit court also heard testimony from a number of other sources, including city officials from the region, area businessmen and other Gateway officials. Most, if not all, testified as to the many benefits that continued expansion of Gateway could potentially bring to the area. The court found that the taking was not excessive and that NCE had been unwilling to negotiate in a meaningful fashion for the sale of the property. The court found that SWIDA had bargained for the property in good faith and NCE’s failure to timely reject SWIDA’s final offer of sale or to present a counteroffer was dispositive of this issue. Therefore, the circuit court held that quick-take procedures were necessary to avoid any negative economic impact to the people of the region.

The circuit court denied NCE’s oral motion for a stay of proceedings (see 735 ILCS 5/7–104(b) (West 1998)) and heard evidence of just compensation for the property (see 735 ILCS 5/7–104(c) (West 1998)). On April 28, 1998, the circuit court made a preliminary finding that $900,000 was just compensation for the property. On April 30, 1998, the circuit court entered an order of taking, vesting SWIDA with title to the property in fee simple and granting it the right to immediate possession of the property. See 735 ILCS 5/7–105(a) (West 1998)). On the same day, SWIDA conveyed title to the property to Gateway by way of a quit-claim deed. NCE filed an emergency motion in the circuit court seeking a stay of the transfer of title or, in the alternative, an order requiring SWIDA to post a bond of $38 million pending appeal. The motion was denied.

Pursuant to section 7–104(b) of the Code of Civil Procedure (735 ILCS 5/7–104(b) (West 1998)) and Supreme Court Rule 307(a)(7) (188 Ill. 2d R. 307(a)(7)), NCE filed an interlocutory appeal arguing in part that SWIDA lacked constitutional authority to take the property and convey it to Gateway. NCE also filed an emergency motion for a stay of the condemnation, which was granted.

The appellate court determined that SWIDA had exceeded its constitutional authority in taking NCE’s land by eminent domain and reversed the decision of the circuit court. 304 Ill. App. 3d 542.

SWIDA filed a petition for leave to appeal pursuant to Supreme Court Rule 317 (134 Ill. 2d R. 317). We granted the petition and on April 19, 2001, reversed the judgment of the appellate court and remanded the cause. Subsequently, NCE petitioned this court for rehearing, which we allowed on June 4, 2001. 155 Ill. 2d R. 367. On rehearing, we now affirm the decision of the appellate court.

ANALYSIS

The State of Illinois, as a sovereign, has the inherent right to condemn property, subject to the state constitutional mandate that private property shall not be taken or damaged for public use without just compensation to its owner. Ill. Const. 1970, art. I, §15; 
Forest Preserve District v. West Suburban Bank
, 161 Ill. 2d 448, 455 (1994). The fifth amendment to the United States Constitution (U.S. Const., amend. V), made applicable to the states through the fourteenth amendment (U.S. Const., amend. XIV), also provides that private property shall not be taken for public use without just compensation. 
Hawaii Housing Authority v. Midkiff
, 467 U.S. 229, 231, 81 L. Ed. 2d 186, 191, 104 S. Ct. 2321, 2324 (1984).

In this case, we determine whether this taking achieves a legitimate public use pursuant to the constitutionally exercised police power of the government (
Berman v. Parker
, 348 U.S. 26, 99 L. Ed. 27, 75 S. Ct. 98 (1954)) and, therefore, whether eminent domain powers authorized by the State of Illinois were improperly exercised in the taking of private property from one private entity for the benefit and use of another private entity.

The right of a sovereign to condemn private property is limited to takings for a public use. U.S. Const., amend. V; Ill. Const. 1970, art. I, §15; 
Gaylord v. Sanitary District
, 204 Ill. 576, 588 (1903). Clearly, private persons may ultimately acquire ownership of property arising out of a taking and the subsequent transfer to private ownership does not by itself defeat the public purpose. 
Hawaii Housing Authority
, 467 U.S. at 243-44, 81 L. Ed. 2d at 199, 104 S. Ct. at 2331. However, that principle alone cannot adequately resolve the issues presented in this case. “Before the right of eminent domain may be exercised, the law, beyond a doubt, requires that the use for which the land is taken shall be public as distinguished from a private use.” 
People ex rel. Tuohy v. City of Chicago
, 394 Ill. 477, 481 (1946).

SWIDA’s action in taking NCE’s property and transferring it to Gateway for Gateway’s private use presents fundamental constitutional issues that are essential to resolving this dispute. The essence of this case relates not to the ultimate transfer of property to a private party. Rather, the controlling issue is whether SWIDA exceeded the boundaries of constitutional principles and its authority by transferring the property to a private party for a profit when the property is not put to a public use.

It may be impossible to clearly delineate the boundary between what constitutes a legitimate public purpose and a private benefit with no sufficient, legitimate public purpose to support it. “We deal, in other words, with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts.” 
Berman
, 348 U.S. at 31-32, 99 L. Ed. at 37, 75 S. Ct. at 102. “While, from time to time, the courts have attempted to define public use, there is much disagreement as to its meaning.” 
Tuohy
, 394 Ill. at 481. Great deference should be afforded the legislature and its granting of eminent domain authority. 
Berman
, 348 U.S. at 31-32, 99 L. Ed. at 37, 75 S. Ct. at 102; 
Old Dominion Land Co. v. United States
, 269 U.S. 55, 66, 70 L. Ed. 162, 165, 46 S. Ct. 39, 40 (1925); 
United States ex rel. Tennessee Valley Authority v. Welch
, 327 U.S. 546, 552, 90 L. Ed. 843, 848, 66 S. Ct. 715, 718 (1946). However, the exercise of that power is not entirely beyond judicial scrutiny (see
 Hawaii Housing Authority
, 467 U.S. at 241, 81 L. Ed. 2d at 197, 104 S. Ct. at 2329 (and cases cited therein)), and it is incumbent upon the judiciary to ensure that the power of eminent domain is used in a manner contemplated by the framers of the constitutions and by the legislature that granted the specific power in question. “Courts all agree that the determination of whether a given use is a public use is a judicial function.” 
Tuohy
, 394 Ill. at 481.

SWIDA contends that the condemnation and taking of NCE’s property is sustainable because a public purpose will be served through (1) the fostering of economic development, (2) the promotion of public safety, and (3) the prevention or elimination of blight. Moreover, once the determination is made that one or all of these requirements is satisfied, “possesory use by the public is not an indispensable prerequisite to the lawful exercise of the power of eminent domain.” 
People ex rel. Gutknecht v. City of Chicago
, 3 Ill. 2d 539, 544-45 (1954).

SWIDA contends that any distinction between the terms “public purpose” and “public use” has long since evaporated and that the proper test is simply to ask whether a “public purpose” is served by the taking. While the difference between a public purpose and a public use may appear to be purely semantic, and the line between the two terms has blurred somewhat in recent years, a distinction still exists and is essential to this case. We agree that these terms are necessarily somewhat loosely defined. However, that does not mean they are indistinguishable. The term “ ‘[p]ublic purpose’ is not a static concept. It is flexible, and is capable of expansion to meet conditions of a complex society that were not within the contemplation of the framers of our constitution.”
 People ex rel. Adamowski v. Chicago R.R. Terminal Authority
, 14 Ill. 2d 230, 236 (1958) (citing 
People ex rel. Gutknecht v. Chicago Regional Port District
, 4 Ill. 2d 363 (1954),
 Grasse v. Dealer’s Transport Co.
, 412 Ill. 179 (1952), 
People v. Chicago Transit Authority
, 392 Ill. 77 (1945), and 
People ex rel. Greening v. Bartholf
, 388 Ill. 445 (1944)). However, this flexibility does not equate to unfettered ability to exercise takings beyond constitutional boundaries. “A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void.” 
Hawaii Housing Authority
, 467 U.S. at 245, 81 L. Ed. 2d at 200, 104 S. Ct. at 2331. As this court held in 
Gaylord
, 204 Ill. at 584, “[t]he public must be to some extent entitled to use or enjoy the property, not as a mere favor or by permission of the owner, but by right.”

Clearly, the taking of slums and blighted areas is permitted for the purposes of clearance and redevelopment, regardless of the subsequent use of the property. See, 
e.g.
, 
Village of Wheeling v. Exchange National Bank of Chicago
, 213 Ill. App. 3d 325 (1991); 
City of Chicago v. Gorham
, 80 Ill. App. 3d 496 (1980); 
City of Chicago v. Walker
, 50 Ill. 2d 69 (1971). However, this proposition and the cases supporting it are of little assistance in this instance, as we are not dealing with a taking for the purposes of eliminating slums or blight.

If this taking were allowed to stand, it may be true that spectators at Gateway would benefit greatly. Developing additional parking could benefit the members of the public who choose to attend events at the racetrack, as spectators may often have to wait in long lines of traffic to park their vehicles and again to depart the facility. We also acknowledge that a public use or purpose may be satisfied in light of public safety concerns. See 
Illinois Toll Highway Comm’n v. Eden Cemetery Ass’n
, 16 Ill. 2d 539 (1959). The public is allowed to park on the property in exchange for the payment of a fee. Gateway’s racetrack may be open to the public, but not “by right.” 
Gaylord
, 204 Ill. at 584. It is a private venture designed to result not in a public use, but in private profits. If this taking were permitted, lines to enter parking lots might be shortened and pedestrians might be able to cross from parking areas to event areas in a safer manner. However, we are unpersuaded that these facts alone are sufficient to satisfy the public use requirement, especially in light of evidence that Gateway could have built a parking garage structure on its existing property.

We have also recognized that economic development is an important public purpose. See 
People ex rel. City of Canton v. Crouch
, 79 Ill. 2d 356 (1980); 
People ex rel. City of Urbana v. Paley
, 68 Ill. 2d 62 (1977); 
People ex rel. City of Salem v. McMackin
, 53 Ill. 2d 347 (1972). SWIDA presented extensive testimony that expanding Gateway’s facilities through the taking of NCE’s property would allow it to grow and prosper and contribute to positive economic growth in the region. However, “incidentally, every lawful business does this.” 
Gaylord
, 204 Ill. at 586. Moreover, nearly a century ago, 
Gaylord
 expressed the long-standing rule that “to constitute a public use, something more than a mere benefit to the public must flow from the contemplated improvement.” 
Gaylord
, 204 Ill. at 584.

This case is strikingly similar to our earlier decision in 
Limits Industrial R.R. Co. v. American Spiral Pipe Works
, 321 Ill. 101 (1926). In 
Limits Industrial
, this court held that a railroad could not exercise eminent domain authority to acquire property for the purpose of expanding its facilities. Despite a certificate of convenience and necessity issued by the Illinois Commerce Commission, we found the proposed spur track and public freight house provided minimal public benefit and principally benefitted the railroad itself and a few other business entities. 
Limits Industrial
, 321 Ill. at 109-10. Similarly, it is incumbent upon us to question SWIDA’s findings as to the parking situation at Gateway and determine whether the true beneficiaries of this taking are private businesses and not the public.

We do not require a bright-line test to find that this taking bestows a purely private benefit and lacks a showing of a supporting legislative purpose. As was the case in 
Limits Industrial
, members of the public are not the primary intended beneficiaries of this taking. 
Limits Industrial
, 321 Ill. at 109-10. This condemnation clearly was intended to assist Gateway in accomplishing their goals in a swift, economical, and profitable manner.

Entities such as SWIDA must always be mindful of expediency, cost efficiency, and profitability while accepting the legislature’s charge to promote development within their defined parameters. However, these goals must not be allowed to overshadow the constitutional principles that lie at the heart of the power with which SWIDA and similar entities have been entrusted. As Justice Kuehn stated in dissent in the appellate court, “If property ownership is to remain what our forefathers intended it to be, if it is to remain a part of the liberty we cherish, the economic by-products of a private capitalist’s ability to develop land cannot justify a surrender of ownership to eminent domain.” 304 Ill. App. 3d at 556 (Kuehn, J., specially concurring).

While the activities here were undertaken in the guise of carrying out its legislated mission, SWIDA’s true intentions were not clothed in an independent, legitimate governmental decision to further a planned public use. SWIDA did not conduct or commission a thorough study of the parking situation at Gateway. Nor did it formulate any economic plan requiring additional parking at the racetrack. SWIDA advertised that, for a fee, it would condemn land at the request of “private developers” for the “private use” of developers. In addition, SWIDA entered into a contract with Gateway to condemn whatever land “may be desired *** by Gateway.” Clearly, the foundation of this taking is rooted not in the economic and planning process with which SWIDA has been charged. Rather, this action was undertaken solely in response to Gateway’s expansion goals and its failure to accomplish those goals through purchasing NCE’s land at an acceptable negotiated price. It appears SWIDA’s true intentions were to act as a default broker of land for Gateway’s proposed parking plan.

This point is further emphasized by the fact that other options were available to Gateway that could have addressed many of the problems testified to by Pritchett, Ortbals and others. Gateway could have built a parking garage structure on its existing property rather than develop the land owned by NCE. However, when Gateway discovered that the cost of constructing a garage on land it already owned was substantially higher than using SWIDA as its agent to take NCE’s property for open-field parking, Gateway chose the easier and less expensive avenue.

As a result of the acquisition of NCE’s property, Gateway could realize an estimated increase of $13 to $14 million in projected revenue per year. While we do not deny that this expansion in revenue could potentially trickle down and bring corresponding revenue increases to the region, revenue expansion alone does not justify an improper and unacceptable expansion of the eminent domain power of the government. Using the power of the government for purely private purposes to allow Gateway to avoid the open real estate market and expand its facilities in a more cost-efficient manner, and thus maximizing corporate profits, is a misuse of the power entrusted by the public.

The legislature intended that SWIDA actively foster economic development and expansion in Madison and St. Clair Counties. 70 ILCS 520/2(g), 5 (West 1998). However, the actions of SWIDA in this case blur the lines between a public use and a private purpose. A highway toll authority may justify the use of eminent domain to ensure that motorists have reasonable access to gas stations. 
Illinois Toll Highway Comm’n
, 16 Ill. 2d at 546. Does the highway authority’s power include the ability to use eminent domain authority to take additional land for a car wash, and then a lube shop? Could the authority then use its power to facilitate additional expansions for a motel, small retail shops, and entertainment centers? The initial, legitimate development of a public project does not justify condemnation for any and all related business expansions.

SWIDA contends that the “wisdom *** of the legislation and ‘the means of executing the project’ are beyond judicial scrutiny ‘once the public purpose has been established.’ It is that purpose which controls and not the ‘means’ or ‘mechanics’ of how the purpose is carried out.” We disagree. The Constitution and the essential liberties we are sworn to protect control. In its wisdom, the legislature has given SWIDA the authority to use eminent domain power to encourage private enterprise and become involved in commercial projects that may benefit a specific region of this state. While we do not question the legislature’s discretion in allowing for the exercise of eminent domain power, “the government does not have unlimited power to redefine property rights.” 
Loretto v. Teleprompter Manhattan CATV Corp.
, 458 U.S. 419, 439, 73 L. Ed. 2d 868, 885, 102 S. Ct. 3164, 3178 (1982). The power of eminent domain is to be exercised with restraint, not abandon.

CONCLUSION

Accordingly, we agree with the appellate court’s finding that, in this case, SWIDA exceeded its constitutional authority in taking NCE’s land by eminent domain. The judgment of the appellate court is therefore affirmed.

Affirmed.

JUSTICE FREEMAN, dissenting:

The majority holds that the Southwestern Illinois Development Authority (SWIDA) may not use the power of eminent domain to take real property owned by National City Environmental, L.L.C., and St. Louis Auto Shredding Company (collectively NCE), and convey same to Gateway International Motorsports Corporation (Gateway). Because I believe the taking at issue is for a public use, and in furtherance of the purposes for which SWIDA was created, I respectfully dissent.

BACKGROUND

I agree with that portion of the majority’s statement of facts setting forth the procedural posture of this case. I also agree with that portion of the statement of facts outlining the creation of SWIDA, the purposes of SWIDA, and the issuance of bonds by SWIDA to finance the costs of acquiring, constructing and installing a multipurpose automotive sports and training facility in the City of Madison. As to the balance of the statement of facts, I find that it contains conclusions unfairly slanted toward the result the majority desires to reach. Additionally, the majority omits certain facts adduced at trial which outline the reasons for the taking, and support the conclusion reached by the circuit court. I believe the reader of this opinion may benefit from a more complete rendition of the evidence in the record.

In June 1996, SWIDA issued $21.5 million in taxable sports facility revenue bonds. Gateway used the proceeds from the bonds to acquire a small racetrack and transform it into a racing and training facility capable of hosting major race car events. In 1997, the racetrack had 25,000 grandstand seats and 25,000 portable seats. The racetrack hosted three major events and a number of smaller events, with total attendance of 400,000. In 1998, Gateway increased seating capacity and hosted four major events at the racetrack. Gateway’s goal is to increase seating capacity in increments to the point where the racetrack has the 85,000 to 100,000 seats needed to host a Winston Cup NASCAR event.

On February 20, 1998, Gateway requested that SWIDA use its quick-take eminent domain powers to acquire a 148.5 acre tract of land (the Property) west of the racetrack for parking. Gateway asked SWIDA to acquire the Property from its owner, NCE, and convey it to Gateway. Gateway paid an application fee of $2,500 to SWIDA, and the sum of $10,000 to be applied toward SWIDA’s sliding scale fee of 6% to 10% of the acquisition price of property being condemned. Gateway also agreed to pay SWIDA’s out-of-pocket expenses or other costs associated with the quick-take process, including the acquisition price of the Property. Members of SWIDA’s board are not entitled to compensation (70 ILCS 520/4(c) (West 1998)) and did not receive any part of these fees.

On February 23, 1998, the St. Clair County board adopted a resolution authorizing SWIDA to exercise its quick-take eminent domain powers to acquire the Property for use by Gateway for racetrack parking. See 70 ILCS 520/8(b) (West 1998) (requiring the approval of the county board before SWIDA can use its quick-take eminent domain powers within the unincorporated areas of a county). The board noted that attendance at the racetrack was expected to increase from 400,000 in 1997 to 600,000 in 1998, and that other development projects in the area would reduce available racetrack parking by 100 acres. The board found that it was necessary to create additional parking areas to safely and adequately service the spectators who would be attending events at the racetrack during 1998 and in subsequent years. Further, the board found that expansion of the racetrack would enhance the public health, safety, morals, happiness, and general welfare of the citizens of southwestern Illinois by increasing the tax base in St. Clair County and generating additional tax revenues.

Upon receipt of the St. Clair County board resolution, SWIDA held a public hearing on March 5, 1998, with notice given to NCE and adjacent property owners. Ray Reott, an attorney representing NCE, attended the meeting and voiced NCE’s objections to the proposed taking. At the meeting, SWIDA adopted a resolution to assist the expansion of the racetrack (the Development Project) through the acquisition of the Property. SWIDA found that the Development Project would enhance the public health, safety, morals, happiness, and the general welfare of the citizens of southwestern Illinois through the creation of job opportunities, the generation of additional tax revenues and the expansion of the tax base within St. Clair County. SWIDA also found that the Property was integral to the success of the Development Project and authorized its executive director to take all necessary and appropriate actions, including negotiations and commencement of quick-take eminent domain proceedings, to acquire title to the Property. Further, SWIDA authorized its chairman or vice-chairman to execute an agreement between SWIDA and Gateway for acquisition of the Property through the use of quick-take eminent domain proceedings and conveyance of the Property to Gateway in furtherance of the Development Project.

Alan Ortbals, SWIDA’s executive director, attended a meeting in Chicago on March 17, 1998, in an attempt to acquire the Property through negotiations. At the meeting, Gateway delivered a written offer to NCE to purchase the Property for $1 million. By letter dated March 19, 1998, NCE rejected the offer, but indicated its willingness to meet the week of March 30, 1998, when NCE expected to have a completed appraisal of the Property. In a separate letter to SWIDA, NCE requested that SWIDA forward copies of any appraisals of the Property in its possession by March 25, 1998. SWIDA complied with this request.

On March 20, 1998, SWIDA made a written offer to NCE to purchase the Property for $1 million, and advised NCE that it would initiate condemnation proceedings if NCE did not accept the offer by 5:00 p.m. on March 30, 1998. SWIDA also attempted to follow through with the suggestion in NCE’s letter of March 19, 1998, that the parties meet the week of March 30, 1998. On March 30, 1998, Harry Sterling, SWIDA’s attorney, and Ortbals attempted to place a conference call to Reott. Reott was not available and failed to return the telephone call.

NCE did not respond to SWIDA’s offer by the stated deadline. Instead, by letter dated April 20, 1998, NCE indicated that it did not feel that it was necessary to respond to SWIDA’s offer because SWIDA knew that NCE had rejected Gateway’s offer to purchase the Property for the identical sum of $1 million. However, to remove any uncertainty on the subject, NCE indicated that it was rejecting SWIDA’s offer.

Meanwhile, on March 31, 1998, SWIDA filed a complaint for condemnation in the circuit court of St. Clair County, seeking to acquire fee simple title to the Property. SWIDA also filed a motion for immediate vesting of title and requested that the court fix a date for a quick-take hearing, pursuant to the quick-take provisions of the Code of Civil Procedure. See 735 ILCS 5/7–103, 7–104 (West 1998).

Also on March 31, 1998, NCE filed a motion to dismiss the complaint for condemnation. Subsequently, on April 2, 1998, NCE filed a traverse and motion to dismiss, arguing that the proposed taking was for an unconstitutional private use; that the proposed taking was excessive; that the racetrack did not need additional parking; and that SWIDA had not made a good faith attempt to agree with NCE on an acceptable purchase price. NCE also filed a motion to strike SWIDA’s request for immediate vesting of title. The circuit court denied NCE’s motion to dismiss and motion to strike SWIDA’s request for immediate vesting of title.

The court proceeded to hold a quick-take hearing. At the hearing, John Baricevic, St. Clair County board chairman, testified that the Property is located in unincorporated St. Clair County, and that the board adopted a resolution authorizing SWIDA to exercise its quick-take eminent domain powers to acquire the Property. Baricevic also testified that certain economic studies were done in connection with the bond issue and Gateway’s acquisition of the racetrack. These studies showed the projected economic impact from the development of the racetrack and from increased attendance as the racetrack expands. No specific studies were made regarding the impact of the proposed taking on tax revenues or the tax base.

Alan Ortbals testified regarding the economic and traffic impact of the racetrack on the surrounding area. Ortbals stated that the racetrack hosted more major races and drew more spectators in 1997 than anticipated in studies performed prior to the development of the racetrack. The racetrack had added 10,000 seats and was ahead of projections for attendance in 1998. As a result, the county was experiencing faster economic spin-off than anticipated. A truck stop across from the racetrack was undergoing expansion; a parcel of land across from the racetrack sold for development of a restaurant; and a golf course was being developed on the site of a former junk yard. In addition, several hotels and restaurants were being developed in the immediate area of the racetrack and in nearby municipalities.

Due to the success of the racetrack, the county was experiencing serious traffic problems on race days with traffic backed up on both sides of Interstate 55-70. A number of racetrack patrons parked east of Illinois Route 203, creating traffic safety problems as they crossed Illinois Route 203 to gain access to the racetrack. Using the Property for racetrack parking would alleviate both of these traffic problems.

Ortbals also testified that when Gateway approached SWIDA regarding the Property, he reviewed the studies that were done in connection with the financing of the racetrack, including an analysis of Gateway’s business plan, an analysis of the economic impact of the racetrack, an analysis of the traffic impact of the racetrack, and a market demand study. He also reviewed an analysis of the economic impact of a similar racetrack in Topeka, Kansas. He presented a report to SWIDA board members regarding these studies. In Ortbals’ opinion as an expert in the field of economic development, SWIDA’s acquisition of the Property by quick-take was necessary to promote economic development, alleviate traffic safety problems, and eliminate blight.

On cross-examination, Ortbals testified that SWIDA did not commission any studies analyzing the effect of the condemnation of the Property on employment levels, the tax base of St. Clair County, or traffic safety problems. Ortbals admitted that there were no slums on the Property. However, the development of the racetrack has had an indirect effect on the elimination of blight in the area. The golf course replaced an old junk yard and three or four dilapidated and abandoned homes on Bend Road have been demolished.

Mike Pritchett, a design and planning engineer employed by the Illinois Department of Transportation (the Department), testified as an expert in the field of civil engineering. He stated that the Department was working with Gateway to find a traffic plan that would move traffic in and out of the racetrack efficiently, with minimal impact on the state and interstate highways. To that end, the Department has studied the traffic patterns occurring around the racetrack. On days of major events, there were significant backups on Interstate 55-70, extending into Missouri. Because the interstate was designed to facilitate travel at high speeds, drivers do not anticipate that cars will be stopped in traffic on the interstate. Stopped traffic on the interstate is thus a safety hazard.

Pritchett also testified that large numbers of racetrack patrons crossed Illinois Route 203 from the parking areas east of the highway to the racetrack. Illinois State Police troopers operate a traffic signal at Ohio Street and Illinois Route 203 manually to allow racetrack patrons to cross the highway. However, the traffic backed up at the signal had negative repercussions on Interstate 55-70. Furthermore, many racetrack patrons crossed at random locations along the highway. When the Department put a fence along Illinois Route 203 to try to channel racetrack patrons to Ohio Street, they pushed the fence down to cross the highway. Although no accidents had yet occurred, there was no assurance that none would.

Pritchett testified further that the Department had improved Illinois Route 203 to help the flow of traffic in and out of the racetrack. These improvements were based on a traffic impact study conducted in 1996, which assumed a considerable amount of parking west of the racetrack. Construction of a parking lot on the Property would provide parking west of the racetrack, as suggested in the study, and alleviate traffic problems on race days. Pritchett concluded that it was necessary, from a safety standpoint, for SWIDA to acquire the Property for development of a parking lot.

On cross-examination, Pritchett testified that taking the Property would not solve all the traffic problems in the area. Some racetrack patrons would continue to park east of Illinois Route 203 and cross the highway to gain access to the racetrack. And if the racetrack was able to host a Winston Cup race, the traffic jams in the area would increase. However, construction of a parking lot on the Property was one of several measures the Department was considering to provide additional access to the racetrack and ease the pressure on Illinois Route 203.

The mayor of the City of Madison testified that the racetrack had brought new jobs to the city and increased revenues from sales and entertainment taxes. He attributed the development of the golf course to the racetrack and testified that several developers were negotiating plans with the city to develop motels and restaurants in the area. He also testified regarding the traffic problems on race days and stated that it would be beneficial to have parking on the Property.

The president of the Village of Fairmont City attributed the development of an 86-room hotel in the village to the racetrack. He testified that continued growth of the racetrack was in the best economic interest of the village.

The president of the Southwestern Illinois Tourism and Convention Bureau, a not-for-profit corporation representing eight southwestern Illinois counties, testified that tourism was the second largest industry in the area. He estimated that in 1997 tourism added between $520 million and $530 million to the economies of the eight counties, with the economic impact of the racetrack being $43.4 million. He also testified that, since January 1, 1996, in excess of 30 hotels had been built, were under construction, or were slated for construction in the area. The racetrack was a major contributing factor to the construction and proposed development of the hotels.

Scott Harding, a consulting engineer, performed an offsite evaluation of the Property. He testified that approximately 27 to 48 acres of the Property constitute wetlands. A developer who proposes to drain and build on an area that has been designated a wetland must first obtain a permit from the United States Army Corps of Engineers, listing conditions that must be met to minimize impact on the wetland, or steps, such as compensation, that must be taken in mitigation. Compensation involves replacing wetland that is used in a project with wetland that is created on another part of the same site or on a different site. Harding testified that Corps of Engineers policies call for compensation ratios of three to one for wooded wetlands, two to one for wetlands with scrub shrub, one and a half to one for emergent wetlands and one to one for farm wetlands. The Corps of Engineers may determine that certain high quality wetlands should not be impacted at all.

Based upon the types of wetland found on the Property, Harding estimated that the Corps of Engineers would require two to one compensation, that is, for every acre of wetland impacted by construction, the Corps of Engineer would require that Gateway create or construct two acres of wetlands. Thus, assuming that Gateway impacted 48 acres of wetlands and compensated on site, approximately 50 acres of land would remain for development.

Rod Wolter, Gateway’s president and general manager, testified that all the major events at the racetrack were sold out in 1997. Total attendance at the racetrack that year was 400,000. The racetrack’s schedule for 1998 listed more events than in 1997. In addition, the racetrack expected sell-out crowds at the major events in 1998. Attendance at those events would be greater than in 1997 because of increased seating capacity at the racetrack.

On cross-examination, Wolter testified that the racetrack had an immediate need for 2,000 to 5,000 parking spaces. The racetrack can park 2,000 cars on as little as 20 acres, and 5,000 cars on as little as 49 acres. The racetrack could get through the 1998 season without the Property, using remote parking areas. On redirect, Wolter testified that it was not in the racetrack’s best interest to “get by” with parking. Lack of adequate parking could result in faltering attendance at the racetrack.

Christopher Pook, the CEO of Grand Prix, testified that Gateway added 10,000 seats to the racetrack in the spring of 1998 and planned to add another 20,000 seats in the fall. He also testified that, in order to obtain a contract to host a NASCAR Winston Cup event, Gateway would have to increase seating capacity to a minimum of 85,000 seats and have adequate parking in place. Gateway has considered building a raised parking garage at the racetrack. However, building such a garage was not economically feasible.

Pook testified next regarding several unsuccessful attempts, starting in May 1995, to reach an agreement with NCE for the use or purchase of the Property. Irv Pielet, one of NCE’s owners, told him repeatedly that NCE was not interested in selling the Property or in any business relationship with Gateway. Pook also testified that two nearby landowners had notified Gateway that 30 acres of land previously used for parking would no longer be available.

Roger Bowler, the plant manager for St. Louis Auto Shredding Company, testified that the plant employed 80 people on a full-time basis. During periods of peak activity, the plant hired additional employees on a part-time basis. On an annual basis, the plant recycled 90,000 to 100,000 cars, recovering metals from the cars for shipment to foundries, steel mills and smelters, and depositing other materials in a landfill operated by the plant. Bowler also testified that the current landfill would be capped in five to eight years and NCE planned to use the Property as its new landfill.

In lieu of personal testimony, the circuit court admitted into evidence Irv Pielet’s discovery deposition. Pielet stated that Pook was interested in some part of NCE’s land for a business venture, but he denied that Pook spoke to him about purchasing the Property. Pielet claimed that he learned of Gateway’s interest in the Property from a newspaper account of the St. Clair County board’s resolution.

Pielet stated further that the NCE’s current landfill had less than 10 years of capacity remaining. However, no studies had been done of the landfill’s capacity and 11 acres of the landfill had not yet been used. Pielet also stated that NCE had taken dirt once from the Property to cover a portion of the current landfill. NCE planned to take more dirt from the Property as needed to cover the section of the landfill the auto recycling plant was currently using. Lastly, Pielet indicated that the Property has 9.2 acres of wetlands.

At the conclusion of the quick-take hearing, the circuit court approved the condemnation. The court found that the taking was for a public purpose, referring specifically to Pritchett’s testimony regarding public safety and Ortbals’ testimony regarding public safety, economic development and the elimination of blight. The court also found, in light of the testimony regarding wetlands and testimony that parking west of the racetrack would promote public safety, that the taking was not excessive. Further, the court found that Pielet had been unwilling to negotiate in a meaningful fashion and the use of quick-take procedures was necessary to avert any negative economic impact to the people of Madison and St. Clair Counties. Finally, the court found that the SWIDA had bargained for the Property in good faith; NCE’s failure to reject SWIDA’s offer in a timely manner or to present a counteroffer was dispositive of this issue.

ANALYSIS

 A. Public Use

The majority recognizes that the State, as a sovereign, has the inherent right to condemn property, subject to the constitutional mandate that private property may not be taken or damaged for public use without just compensation to the owner. See slip op. at 7. Further, the majority recognizes that the subsequent transfer of property to a private entity does not transform a taking for public use into a taking for private use. See slip op. at 8. The majority correctly cites 
Hawaii Housing Authority v. Midkiff
, 467 U.S. 229, 81 L. Ed. 2d 186, 104 S. Ct. 2321 (1984), and 
Berman v. Parker
, 348 U.S. 26, 99 L. Ed. 27, 75 S. Ct. 98 (1954), for these propositions. However, 
Hawaii Housing Authority
 and 
Berman
 provide additional guidance in this area of law, which the majority fails to acknowledge. Contrary to the holdings of 
Hawaii Housing Authority
 and 
Berman
, the majority gives little deference to the legislature’s public use determination. Further, the majority engrafts upon 
Hawaii Housing Authority
 and 
Berman
 a requirement that property taken by eminent domain be put into use for the public, a proposition specifically rejected by the Court in 
Hawaii Housing Authority
. See 
Hawaii Housing Authority
, 467 U.S. at 243-44, 81 L. Ed. 2d at 199, 104 S. Ct. at 2331. Today’s opinion is not an accurate rendition of the holdings of 
Hawaii Housing Authority
 and 
Berman
 and of the principles of law involved in this area.

In 
Berman
, 348 U.S. 26, 99 L. Ed. 27, 75 S. Ct. 98, the Supreme Court upheld the constitutionality of the District of Columbia Redevelopment Act of 1945 (60 Stat. 790, D.C. Code §§5–701 through 5–719 (1951)). That act provided for the use of eminent domain to acquire property in slums and blighted areas and for the lease or sale of the property to private interests for redevelopment pursuant to a comprehensive redevelopment plan. The appellants argued that their property could not be taken constitutionally because the property was commercial, not residential property; the property was not slum housing; the property would be put into the project under the management of a private, not a public, agency and redeveloped for private, not public, use. The Court considered first whether the takings authorized by the act were for a public use, stating:

“The power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs. [Citation.] We deal, in other words, with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia [citation] or the States legislating concerning local affairs. [Citations.] This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one.” 
Berman
, 348 U.S. at 31-32, 99 L. Ed. at 37, 75 S. Ct. at 102.

The Court then rejected the appellants’ contention that their property was being taken for a private use because the property would be transferred to a private individual or company, stating:

“Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. [Citations.] Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. [Citations.] The public end may be as well or better served through an agency of private enterprise than through a department of government–or so the Congress might conclude.” 
Berman
, 348 U.S. at 33-34, 99 L. Ed. at 38, 75 S. Ct. at 103.

In 
Hawaii Housing Authority
, 467 U.S. at 240, 81 L. Ed. 2d at 197, 104 S. Ct. at 2329, the Supreme Court explained that the public use principle is “coterminous with the scope of a sovereign’s police powers.” The Court also explained the role of the judiciary in reviewing a legislature’s public use determination:

“There is, of course, a role for courts to play in reviewing a legislature’s judgment of what constitutes a public use, even when the eminent domain power is equated with the police power. But the Court in 
Berman
 made clear that it is ‘an extremely narrow’ one. [Citation.] The Court in 
Berman
 cited with approval the Court’s decision in 
Old Dominion Co. v. United States
, 269 U.S. 55, 66 (1925), which held that deference to the legislature’s ‘public use’ determination is required ‘until it is shown to involve an impossibility.’ The 
Berman
 Court also cited to 
United States ex rel. TVA v. Welch
, 327 U.S. 546, 552 (1946), which emphasized that ‘[a]ny departure from this judicial restraint would result in courts deciding on what is and is not a governmental function and in their invalidating legislation on the basis of their view on that question at the moment of decision, a practice which has proved impracticable in other fields.’ In short, the Court has made clear that it will not substitute its judgment for a legislature’s judgment as to what constitutes a public use ‘unless the use be palpably without reasonable foundation.’ [Citation.]

*** [W]here the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause.” 
Hawaii Housing Authority
, 467 U.S. at 240-41, 81 L. Ed. 2d at 197-98, 104 S. Ct. at 2329-30.

See also 
National R.R. Passenger Corp. v. Boston & Maine Corp.
, 503 U.S. 407, 422, 118 L. Ed. 2d 52, 69, 112 S. Ct. 1394, 1404 (1992).

Additionally, the Court reaffirmed the principle outlined in 
Berman
 that a taking for a public use is not transformed into a private taking through a subsequent transfer to a private party. The Court stated:

“The mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose. The Court long ago rejected any literal requirement that condemned property be put into use for the general public. ‘It is not essential that the entire community, nor even any considerable portion, ... directly enjoy or participate in any improvement in order [for it] to constitute a public use.’ [Citation.] ‘[W]hat in its immediate aspect [is] only a private transaction may ... be raised by its class or character to a public affair.’ *** [G]overnment does not itself have to use property to legitimate the taking; it is only the taking’s purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause.” 
Hawaii Housing Authority
, 467 U.S. at 243-44, 81 L. Ed. 2d at 199, 104 S. Ct. at 2331.

This court has, heretofore, been guided by the principles outlined in
 Berman
. Thus, in 
People ex rel. Adamowski v. Chicago R.R. Terminal Authority
, 14 Ill. 2d 230 (1958), this court held constitutional the Railroad Terminal Authority Act (Ill. Rev. Stat. 1957, ch. 114, pars. 361 through 389). This court noted that the plaintiff’s basic objection was that the principal beneficiaries of the act were private corporations. This court stated:

“To the extent that plaintiff’s contentions are directed to an alleged absence of public use and public purpose, they are without merit. The General Assembly has described in considerable detail the conditions which the act is designed to eliminate and has declared the public use and public interest that it found to exist. Such a legislative declaration is not to be lightly set aside. [Citations.] ‘Public purpose’ is not a static concept. It is flexible, and is capable of expansion to meet conditions of a complex society that were not within the contemplation of the framers of our constitution. [Citations.]

The primary objects of the statute are the removal of the blighted conditions caused by antiquated terminal areas, the promotion of the growth and development of the city, and the relief of traffic congestion ***. [Citations.] It may be that private railroad corporations will derive some benefit under the act. Those benefits, however, will be incidental to the principal purpose of the statute ***.” 
Adamowski
, 14 Ill. 2d at 235-36.

In 
Illinois Toll Highway Comm’n v. Eden Cemetery Ass’n
, 16 Ill. 2d 539, 541 (1959), the Illinois Toll Highway Commission sought to acquire an underground easement for sewer and water facilities through the defendants’ cemetery property. The defendants objected that the property was being taken to service a gasoline station to be operated by a private corporation and to service a privately owned restaurant. This court noted that the purpose of the toll highways was to provide fast, through traffic in a safe manner, and that it was necessary that gasoline service stations and restaurants be located on or in close proximity to the highway proper, thereby reducing a great number of entrances and exits to reach these services. This court reasoned:

“As plaintiff points out, the operations of a gas station or a restaurant are specialized businesses, and are enterprises calling for experts in these fields. So the legislature wisely granted to the Commission the power to make contracts with, and to grant concessions to, and to lease to persons and private corporations. As the court said in the case of 
Berman v. Parker
, 348 U.S. 26, 99 L. ed. 27, at pages 33-34: ‘The public end may be as well or better served through an agency of private enterprise than through a department of government–or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects.’

We therefore conclude that service stations and restaurants are an integral part of the toll road system, whether they be operated by the Toll Highway Commission or leased to a private corporation who may be better able to carry on the business, thus bringing about the desired result. We think, further, that since access to sewer and water facilities is essential to the operation of service stations and restaurants, the reasoning which sustains the propriety of arrangements for the latter must uphold as well a reasonable exercise of condemnation powers in obtaining the former. The present exercise of the power has not been shown to be unreasonable under the circumstances ***.” 
Eden Cemetery Ass’n
, 16 Ill. 2d at 545-46.

See also 
People ex rel. City of Urbana v. Paley
, 68 Ill. 2d 62, 76 (1977) (“It is apparent that the city of Urbana intends to undertake the redevelopment in question primarily for the purpose of revitalizing an economically stagnant downtown area. The purpose of the project is therefore clearly and predominantly a public purpose, and the benefit reaped by private developers is merely an inevitable incident thereto”); 
People ex rel. City of Salem v. McMackin
, 53 Ill. 2d 347, 355 (1972) (“While we acknowledge that there is a benefit to private interests in the financing of industrial projects under the Act, we hold that the principal purpose and objective of the Act is public in nature. Therefore, it does not matter that there will be an incidental benefit to private interests”); 
City of Chicago v. Barnes
, 30 Ill. 2d 255, 257 (1964) (“it does not follow that because the land may later be sold to a private developer its taking and clearance cannot have been for a public purpose”).

Turning to the statute in the present case, I note that the legislature determined that “labor surplus areas currently exist in the southwestern part of the State” (70 ILCS 520/2(a) (West 1998)) and recognized that “the economic burdens resulting from involuntary unemployment fall in part upon the State in the form of increased need for public assistance and reduced tax revenues and, in the event that the unemployed worker and his family migrate elsewhere to find work, may also fall upon the municipalities and other taxing districts within the areas of unemployment in the form of reduced tax revenues, thereby endangering their financial ability to support necessary governmental services for their remaining inhabitants.” 70 ILCS 520/2(b) (West 1998). The legislature also found “[t]hat a lack of decent housing contributes to urban blight, crime, anti-social behavior, disease, a higher need for public assistance, reduced tax revenues, and the migration of workers and their families away from areas which fail to offer adequate, decent, affordable housing.” 70 ILCS 520/2(d) (West 1998). Thus, the legislature described in detail the conditions the Act was designed to eliminate.

Further, the legislature declared that “decent, affordable housing” (70 ILCS 520/2(e) (West 1998)) and access to “educational institutions, recreation, parks and open spaces, entertainment and sports, a reliable transportation network, cultural facilities and theaters” (70 ILCS 520/2(f) (West 1998)) should be available to every citizen. The legislature also declared that “the State has a responsibility to help create a favorable climate for new and improved job opportunities for its citizens by encouraging the development of commercial and service businesses and industrial and manufacturing plants within the southwestern part of the State.” 70 ILCS 520/2(c) (West 1998). The legislature affirmed that “the main purpose of this Act is to promote industrial, commercial, residential, service, transportation and recreational activities and facilities, thereby reducing the evils attendant upon unemployment and enhancing the public health, safety, morals, happiness and general welfare of this State.” 70 ILCS 520/2(g) (West 1998).

The legislature created SWIDA to promote development in Madison and St. Clair Counties. It charged SWIDA with the duty to assist in the development, construction and acquisition of industrial projects, housing or residential projects, and commercial projects including cultural facilities such as sports training facilities, racetracks, and parking facilities. 70 ILCS 520/3, 520/6 (West 1998). In turn, SWIDA issued $21.5 million of bonds to facilitate the development of the racetrack. SWIDA now seeks to condemn the Property to further the development of the racetrack by increasing available parking. The development of parking facilities is both a project contemplated under the Act and part of the continued development of the racetrack.

This court has previously upheld the validity of legislative enactments designed to assist economic development (
People ex rel. City of Canton v. Crouch
, 79 Ill. 2d 356, 364 (1980); 
Paley
, 68 Ill. 2d at 76; 
McMackin
, 53 Ill. 2d at 358), to prevent or eliminate blight involving both structural infirmity and economic deterioration (
Paley
, 68 Ill. 2d at 74;
 Barnes
, 30 Ill. 2d at 256; 
People ex rel. Gutknecht v. City of Chicago
, 3 Ill. 2d 539, 545 (1954); 
Chicago Land Clearance Comm’n v. White
, 411 Ill. 310, 316 (1952); 
Cremer v. Peoria Housing Authority
, 399 Ill. 579, 588 (1948); 
Zurn v. City of Chicago
, 389 Ill. 114, 128 (1945), and to promote public safety (
Eden Cemetery Ass’n
, 16 Ill. 2d at 544). See also 
Adamowski
, 14 Ill. 2d at 236 (blighted conditions, promotion of the growth and development of the city and the relief of traffic congestion). Such legislative determinations are well within the State’s police powers.

In the present case, the majority cannot dispute the legislative findings regarding the need to alleviate certain economic, housing and other conditions in the southwestern part of this state. Nor can the majority dispute that alleviation of these conditions furthers certain public purposes. The legislature is, after all, “the main guardian of the public needs to be served by social legislation.” 
Berman
, 348 U.S. at 31-32, 99 L. Ed. at 37, 75 S. Ct. at 102. And, the legislature has determined, as it well may, to use the power of eminent domain to realize its objective. See 
Berman
, 348 U.S. at 31-32, 99 L. Ed. at 37, 75 S. Ct. at 102. The legislature has vested in SWIDA the power of eminent domain so that SWIDA may assist in the development of housing, industrial and commercial projects in the area. The legislature has also given SWIDA the power to issue bonds to generate the financial wherewithal for the development of the projects. The means employed by the legislature to further the public purposes at issue are not irrational.

Applying the holdings of 
Hawaii Housing Authority
 and 
Berman
, this court should defer to the legislative determination of the public use. Although the majority acknowledges that great deference is due the legislative determination (see slip op. at 9), the majority does not act in accordance with such deference. Indeed, the majority does not afford any measure of deference to the legislative determination.

The majority opinion is alarming both for its use of selective portions of 
Hawaii Housing Authority
 and 
Berman
 and for its attempt to engraft an additional principle upon the public use doctrine. The majority states,

“ ‘A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void.’ 
Hawaii Housing Authority
, 467 U.S. at 245, 81 L. Ed. 2d at 200, 104 S. Ct. at 2331. As this court held in 
Gaylord
, 204 Ill. at 584, ‘[t]he public must be to some extent entitled to use or enjoy the property, not as a mere favor or by permission of the owner, but by right.’ ” Slip op. at 10.

The majority fails to acknowledge, however, that the Court in 
Hawaii Housing Authority
 specifically rejected a requirement that the property be put into use for the public,

“The Court long ago rejected any literal requirement that condemned property be put into use for the general public. ‘It is not essential that the entire community, nor even any considerable portion, ... directly enjoy or participate in any improvement in order [for it] to constitute a public use.’ [Citation.] ‘[W]hat in its immediate aspect [is] only a private transaction may ... be raised by its class or character to a public affair.’ *** [G]overnment does not itself have to use property to legitimate the taking; it is only the taking’s purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause.” 
Hawaii Housing Authority
, 467 U.S. at 243-44, 81 L. Ed. 2d at 199, 104 S. Ct. at 2331.

Not only is the majority disingenuous in its citation to 
Hawaii Housing Authority
 and 
Berman
 but it seeks to unravel the holdings of these opinions, for in imposing a requirement that the property be put into use for the general public, the majority effectively interdicts any taking for the purpose of economic development.

I must inquire of the majority what development project can satisfy the requirement that the public be “entitled to use or enjoy the property, not as a mere favor or by permission of the owner, but by right”? Can a member of the general public enter a manufacturing plant as of right? What of a sports facility? Can a member of the general public enter a stadium, or for that matter the racetrack at issue, without paying a fee for the privilege? The majority states,

“We also acknowledge that a public use or purpose may be satisfied in light of public safety concerns. See 
Illinois Toll Highway Comm’n v. Eden Cemetery Ass’n
, 16 Ill. 2d 539 (1959). The public is allowed to park on the property in exchange for the payment of a fee. Gateway’s racetrack may be open to the public, but not ‘by right.’ ” Slip op. at 10-11.

Again, I ask what project will survive the majority’s requirement of use as of right by the general public?

I suggest that, in its attempt to reach a particular result, the majority does great harm to the public use doctrine and to the interests of this state.

B. Particular Taking

The majority errs in other ways. In considering the taking at issue, the majority applies the wrong standard of review and ignores the evidence adduced at trial.

Section 7–104(b) of the Code of Civil Procedure provides in part:

“At the [quick-take] hearing, if the court has not previously, in the same proceeding, determined that the plaintiff has authority to exercise the right of eminent domain, that the property sought to be taken is subject to the exercise of such right, and that such right is not being improperly exercised in the particular proceeding, then the court shall first hear and determine such matters.” 735 ILCS 5/7–104(b) (West 1998).

A finding on each of these three issues amounts to a determination of whether or not the plaintiff has the right to take the property by eminent domain. See 
Department of Public Works & Buildings v. Dust
, 19 Ill. 2d 217, 219 (1960). As this court noted in 
Department of Transportation v. First Galesburg National Bank & Trust Co.
, 141 Ill. 2d 462, 468 (1990), the plaintiff has only such powers of eminent domain as are conferred upon it by the legislature. See also 
Department of Public Works & Buildings v. Keller
, 61 Ill. 2d 320 (1975). The law conferring the right of eminent domain must be strictly construed. 
First Galesburg National Bank
, 141 Ill. 2d at 469.

When a defendant files a motion to dismiss challenging the authority to condemn, the burden is on the condemning authority to make a 
prima facie
 case of the disputed allegations. 
First Galesburg National Bank
, 141 Ill. 2d at 469; 
Keller
, 61 Ill. 2d at 324. This burden may be met by introducing in evidence a statute affirming the authority’s right to acquire property by eminent domain (see 
First Galesburg National Bank
, 141 Ill. 2d at 469), or a resolution and ordinance approving the taking (see 
City of Chicago v. Walker
, 50 Ill. 2d 69, 71 (1971)). Once the condemning authority has made a 
prima facie
 case, the defendant is required to go forward with evidence showing that there was an abuse of discretion by the condemning authority. 
First Galesburg National Bank
, 141 Ill. 2d at 470; 
Keller
, 61 Ill. 2d at 325. The courts will interfere only where an abuse of discretion is shown, for as this court has held many times:

“[W]hether the exercise of the power of eminent domain is necessary or expedient to accomplish an authorized purpose is not a question within the province of the court to determine. The agency on which the power has been conferred also has the authority to decide the necessity for its exercise. In the absence of a clear abuse of this authority the courts will not inquire into the necessity or the propriety of its exercise.” 
Keller
, 61 Ill. 2d at 325 (citing 
Department of Public Works & Buildings v. McNeal
, 33 Ill. 2d 248 (1965), 
Forest Preserve District v. Wike
, 3 Ill. 2d 49 (1954), 
City of Chicago v. Vaccarro
, 408 Ill. 587 (1951), and 
Zurn v. City of Chicago
, 389 Ill. 114 (1945)).

In the present case, SWIDA satisfied its 
prima facie
 burden of proof. Pursuant to section 8 of the Act, SWIDA may acquire real property, or rights therein, upon condemnation. 70 ILCS 520/8(b) (West 1998). Section 5 of the Act commands SWIDA to assist in the development of commercial projects, including racetracks and parking facilities. 70 ILCS 520/5 (West 1998). SWIDA introduced into evidence a resolution adopted by the St. Clair County board authorizing the acquisition of the Property by use of quick-take eminent domain. SWIDA also introduced into evidence a resolution it adopted to acquire the Property by quick-take eminent domain. The resolutions state that it is necessary to create additional parking areas for the racetrack to safely and adequately service racetrack spectators and that the acquisition of the Property for parking purposes will enhance the public health, safety, morals, happiness, and the general welfare of the citizens of southwestern Illinois through the creation of job opportunities, the generation of additional tax revenues and the expansion of the tax base within St. Clair County. This evidence suffices for a 
prima facie
 case.

It became incumbent upon NCE to introduce evidence showing that SWIDA had abused its discretion. NCE failed in this undertaking. The evidence at the hearing fully supports the circuit court’s determination that taking the Property will further economic development, promote safety, and lead to the elimination of blight in the area.

The majority disagrees. As to the elimination of blight, the majority simply states, “we are not dealing with a taking for the purposes of eliminating slums or blight.” Slip op. at 10. Nothing is said of Ortbals’ testimony on the subject.

The majority is more forthright on the subject of economic development. As the majority notes,

“SWIDA presented extensive testimony that expanding Gateway’s facilities through the taking of NCE’s property would allow it to grow and prosper and contribute to positive economic growth in the region.” Slip op. at 11.

However, the majority quickly dispenses with this “extensive testimony” of economic development. The majority simply notes that “ ‘incidentally, every lawful business does this.’ ” Slip op. at 11, quoting 
Gaylord v. Sanitary District
, 204 Ill. 576, 586 (1903).

The majority reluctantly acknowledges the evidence regarding public safety. The majority notes,

“If this taking were permitted, lines to enter parking lots might be shortened and pedestrians might be able to cross from parking areas to event areas in a safer manner.” Slip op. at 11.

However, this acknowledgment fails to convey the full impact of the trial testimony regarding public safety. Pritchett testified that it was necessary, from a safety standpoint, for SWIDA to acquire the Property for development of a parking lot. Ortbals testified that using the Property for racetrack parking would alleviate the traffic back-ups on Interstate 55-70 and allow racetrack patrons parked east of Illinois Route 203 to gain access to the racetrack safely.

Acknowledgment aside, the majority then rejects the evidence as to the traffic safety concerns. The majority states,

“[W]e are unpersuaded that these facts alone are sufficient to satisfy the public use requirement, especially in light of evidence that Gateway could have built a parking garage structure on its existing property.” Slip op. at 11.

The majority’s conclusion is not supported by the record. Wolter testified at trial that the racetrack had an immediate need for 2,000 to 5,000 parking spaces. Pook testified at trial that Gateway had considered building a raised parking garage at the racetrack. However, building such a garage was not economically feasible. NCE introduced no evidence that building a raised parking garage with 5,000 parking spaces was feasible, economically or otherwise. Given the number of parking spaces at issue and NCE’s failure to present any evidence on this matter, the majority’s conclusion demonstrates either a general misapprehension of the nature of appellate review or a deliberate choice to substitute the judgment of this court for the record and proper inferences to be drawn therefrom.

Moreover, in questioning the necessity of the taking, the majority applies the wrong standard of review. As noted above, this court has previously recognized that

“The agency on which the power has been conferred also has the authority to decide the necessity for its exercise. In the absence of a clear abuse of this authority the courts will not inquire into the necessity or the propriety of its exercise.” 
Keller
, 61 Ill. 2d at 325 (citing 
McNeal
, 33 Ill. 2d 248, 
Wike
, 3 Ill. 2d 49, 
Vaccarro
, 408 Ill. 587,
 and  
Zurn
, 389 Ill. 114).

The legislature has vested in SWIDA the power of eminent domain to assist in the development of commercial projects including racetracks and parking facilities. The acquisition of the Property being in furtherance of three distinct public purposes, SWIDA did not abuse its discretion by the use of its eminent domain powers. The evidence at trial is not contrary and judicial intervention is unwarranted.

CONCLUSION

I agree with the circuit court that SWIDA properly exercised its power of eminent domain. The taking of the Property was for a public use, not a private use. The majority errs in its application of the standard of review. The majority also errs in its willingness to dispense with strong evidence at trial supporting the circuit court’s decision. Lastly, the majority commits great disservice to the State of Illinois and its citizens in engrafting upon the public use doctrine the requirement that property taken by eminent domain must be accessible to the general public as of right. This requirement is the death of social legislation in furtherance of economic development and revitalization. I respectfully dissent.

JUSTICE McMORROW joins in this dissent.